## HENRY IVES COBB

*v.*

## THE COMMISSIONERS OF LINCOLN PARK.

*Opinion filed April 24, 1903.*

1. WATERS—*rights of shore owner at common law.* Under the common law a lake shore owner has a right to accretions and of access to the waters of the lake for the width of his premises bordering thereon, but unless he owns the submerged land or has permission from one having title thereto he has no right to build any structure upon it. (*Revell* v. *People*, 177 Ill. 468, adhered to.)

2. SAME—*title to submerged lands not burdened with an easement.* The title to submerged lands in front of adjoining upland is not burdened with an easement in favor of the owner of the upland for the purpose of building wharves or other structures upon the submerged land to reach navigable water.

3. SAME—*the State has power to grant title to submerged land in Lake Michigan.* The title to the submerged lands of Lake Michigan being in the State, it was within the power of the legislature to pass the act of 1895, (Laws of 1895, p. 282,) granting certain submerged lands to the commissioners of Lincoln Park for specified purposes.

4. SAME—*effect of license from Secretary of War to build wharf.* An owner of property bordering on Lake Michigan and adjoining submerged lands to which the commissioners of Lincoln Park hold title, has no right to build a wharf upon such lands without consent of the commissioners, notwithstanding he has a license from the Secretary of War to construct the wharf.

APPEAL from the Circuit Court of Cook county; the Hon. R. W. CLIFFORD, Judge, presiding.

This was a bill in chancery filed in the circuit court of Cook county by Henry Ives Cobb, the appellant, as the owner in fee simple of a lot situated on the west bank of Lake Michigan and abutting on the waters of the lake. The bill alleged that as a riparian owner he had the right to erect wharves into the waters of the lake to the point of navigability, to enable him to reach the navigable waters, as the water in front of his lot, for a distance of from five to six hundred feet, was too shallow

to enable the steamers plying on the great lakes to approach the shore for purposes of commerce; that he had executed a lease of this lot to the Western Stone Company, binding him to erect a permanent wharf from the shore into Lake Michigan to the point of navigability, for the use of said company; that he had applied to the defendants, the Commissioners of Lincoln Park, who claimed title to the submerged lands in front of appellant's property by virtue of an act of the legislature approved June 15, 1895, for leave to construct such wharf, but that permission had been refused him, and that he had been informed by appellees that they would prevent him from building any wharf from the shore of his property out into Lake Michigan, and would use their police force for that purpose; that appellant has the consent of the Secretary of War of the United States to construct said wharf.    The bill prayed for an injunction to enjoin appellees from interfering with him in the construction of his wharf.    The commissioners answered, and on the hearing the bill was dismissed for want of equity.    Appellant then took this appeal to this court.

PENCE & CARPENTER, for appellant:

The commerce clause of the constitution of the United States grants to Congress the power to control and regulate navigation, and appellant's rights in this regard are guaranteed and protected by that constitution and the several acts of Congress passed pursuant thereto. *Laxton* v. *Bridge Co.* 153 U. S. 525; *Gibbons* v. *Ogden,* 9 Wheat. 1; *Pennsylvania* v. *Bridge Co.* 13 How. 518; *Stockton* v. *Railroad Co.* 37 Fed. Rep. 919; *Hawkins' Lighthouse case,* 39 id. 77.

A riparian owner on a navigable body of water has a right of access from his shore to that part of the water which is navigable, and this right of access includes the right to build a wharf or pier from the shore line to the nearest convenient point of navigation. *Lyon* v. *Fishmonger's Co.* L. R. 1 H. L. & Privy Council, (App. Cas.) 662;

*Duke of Buccleugh* v. *Board of Works,* L. R. 5 H. L. (E. & I. App.) 418; *Board of Works* v. *McCarty,* L. R. 7 H. L. 243; *Railway Co.* v. *Pion,* L. R. 14 H. L. & Privy Council, (App. Cas.) 612; *Byron* v. *Stimpson,* 1 Pug. & B. 697; *Regina* v. *Rynd,* 16 Ir. Com. L. 29; *Attorney General* v. *Wemyss,* L. R. 13 H. L. & Privy Council, (App. Cas.) 192; *Rumsey* v. *Railway Co.* 133 N. Y. 79; *Sage* v. *Maher,* 154 id. 70; *Mather* v. *Chapman,* 40 Conn. 382; *State* v. *Sargeant,* 45 id. 358; *Clark.* v. *Peckham,* 10 R. I. 35; *Farist S. Co.* v. *Bridgeport,* 60 Conn. 278; *Concord* v. *Robertson,* 66 N. H. 1; *Saunders* v. *Railroad Co.* 144 N. Y. 75; *Bowman* v. *Mathem,* 2 McLean, 376; *Myers* v. *St. Louis,* 8 Mo. App. 270; *Railroad Co.* v. *Stock Yards Co.* 120 Mo. 541; *Railway Co.* v. *Faunce,* 31 Gratt. 761; *Railroad Co.* v. *Chase,* 43 Md. 23; *Union Depot S. R. & T. Co.* v. *Brunswick,* 31 Minn. 297; *Lamprey* v. *Minnesota,* 52 id. 181; *Carli* v. *Railway Co.* 28 id. 373; *Brisbine* v. *Railroad Co.* 23 id. 114; *Diedrich* v. *Railroad Co.* 42 Wis. 248; *McLellan* v. *Prentice,* 85 id. 427; *Delaplaine* v. *Railway Co.* 42 id. 214; *Case* v. *Toftus,* 39 Fed. Rep. 730; *Backus* v. *Detroit,* 49 Mich. 110; *Sherlock* v. *Bainbridge,* 41 Ind. 42; *Bainbridge* v. *Sherlock,* 29 id. 364; *Dutton* v. *Strong,* 1 Black, 22; *Wilson* v. *Welch,* 12 Ore. 353; *Parker* v. *Packing Co.* 17 id. 510; *Railroad Co.* v. *Schurmeier,* 7 Wall. 272; *Yates* v. *Milwaukee,* 10 id. 497; *Atlee* v. *Packet Co.* 88 U. S. 389; *Railroad Co.* v. *Illinois,* 146 id. 387; Gould on Waters, secs. 149-151; 29 Am. & Eng. Ency. of Law, 65.

A shore owner's right of access to the navigable part of the adjacent body of water is a valuable right, and cannot be taken away without due compensation.

FRANK HAMLIN, for appellees:

The littoral rights of the shore owners on Lake Michigan are, in Illinois, the same as the riparian rights of shore owners upon navigable waters in England by the common law in the fourth year of James I. *Shively* v. *Bowlby,* 152 U. S. 1; *Seaman* v. *Smith,* 24 Ill. 521; *Trustees* v. *Schroll,* 120 id. 518; *Fuller* v. *Shedd,* 161 id. 462; *People* v. *Revell,* 177 id. 468.

These rights are the rights of imperceptible accretion and the right of access to the water. *Shively* v. *Bowlby*, 152 U. S. 1; *Revell* v. *People*, 177 Ill. 468.

The right of access does not involve any right to construct purprestures on submerged lands or to use in any way the bed of the water, but only furnishes à right of way over any obstructions made by the owner of the submerged lands, placed between the littoral owner and the water. *Shively* v. *Bowlby*, 152 U. S. 1; *Buccleugh* v. *Board of Works*, L. R. 5 H. L. 418; *Austin* v. *Railroad Co.* 45 Vt. 215; *Lyon* v. *Fishmonger's Co.* 1· App. Cas. 662.

Cases which hold that the right to wharf out pertains to the littoral owner are based upon the principle that the title or ownership of the riparian owner extends to the thread of the stream. They do not apply in those cases wherein the property in question abuts upon navigable water. *People* v. *Revell*, 177 Ill. 468.

Particularly is the above theory true in connection with the decisions in the State of Illinois; that is to say, it is only in case of ownership of the riparian proprietor to the thread of the stream that the Illinois courts have held that the right to wharf out exists. *People* v. *Revell*, 177 Ill. 468; *Middleton* v. *Prichard*, 3 Scam. 509; *Ensminger* v. *People*, 47 Ill. 384; *Chicago* v. *Laflin*, 49 id. 176; *Braxton* v. *Bressler*, 64 id. 488; *Austin Ice Co.* v. *Shortall*, 105 id. 52; *People* v. *Supervisors*, 125 id. 23.

Mr. JUSTICE CARTER delivered the opinion of the court:

The only question in this case, as stated by appellant, is, whether the owner of land bordering on and adjacent to the waters of Lake Michigan has a right of access from his own property to a point in the lake where the waters are navigable, and whether, in the exercise of this right, he may erect a wharf or pier from his shore line over the submerged lands in the shallow water to the point of navigability in the lake. Appellant insists that the riparian owner has this right of access, and

that it includes the right to wharf out,—that is, to erect wharves and piers in front of his land.

The riparian owner's right of access from his land to the lake,—in other words, the right to pass to and from the waters of the lake within the width of his premises as they border on the lake,—has been expressly recognized by this court as a common law right, which cannot be taken from him without just compensation. (*Revell* v. *People*, 177 Ill. 468.) In a large number of the cases relied on by the appellant this right of access was the only question involved, and they are authority only to that extent. It is true, the courts in many cases have indulged in general expressions as to what is included in the owner's right of access to the water, and have stated the right to erect wharves and piers as one of the rights included therein; but this was by way of illustration, and was not necessary to the decision of the case. Many judges, in dealing with the question of riparian rights, seem to have enlarged on those rights, and to have assumed that the right to erect a wharf on the shore and into the water, even to the point of navigability, was a common law right, although the point decided did not involve this question.

This whole subject is intimately connected with the ownership of the soil under the water of the sea, lake or navigable stream, as the case may be. In England, since the time of Lord Hale, it has been treated as settled that the title in the soil of the sea or of arms of the sea, below ordinary high-water mark, is in the sovereign, except so far as an individual or a corporation has acquired rights in it by express grant or by prescription or usage, and that this title, *jus privatum*, whether in the sovereign or in the subject, is held subject to the public right, *jus publicum*, of navigation and fishing. (*Shively* v. *Bowlby*, 152 U. S. 1.) This is the doctrine of this State as applied to the lands under the navigable waters of Lake Michigan. *People* v. *Kirk*, 162 Ill. 138; *Revell* v. *People*, *supra*.

The State has granted the land covered by the waters of Lake Michigan that lies immediately in front of appellant's lands to appellees, the park commissioners, for certain specific purposes, and the title thereto is now in them for the purposes declared in the act. (Act of June 15, 1895; Laws of 1895, p. 282.) This the legislature was competent to do. (*People* v. *Kirk, supra.*) The property in the dry land or upland being in one person and the property in the submerged land immediately in front thereof being in another, it would seem to be only consonant with legal principles that the consent of the latter must be obtained before any erections can be put on the submerged soil. But the appellant claims that by the common law he had the right to erect a wharf or other structure in aid of navigation on the submerged land in front of his upland, and that the title of appellees is burdened with such easement or right in him. In *Revell* v. *People, supra,* we said (p. 484): "In the well known case of *Shively* v. *Bowlby, supra,* the Supreme Court of the United States, after a thorough examination of the authorities, held that the common law of England is the law of this country upon the question of the rights of a shore owner, except where it has been modified by the constitutions, statutes or usages of the different States or by the constitution and laws of the United States. The court also held that the rights of these owners have been committed to the several States, and that each State has dealt with the lands under tide water within its boundaries according to its own notion of right and public policy." "This State has adopted the common law as it existed prior to March 24, 1606,—the fourth year of James I,—and in the absence of any statute of the State changing the common law in regard to rights of riparian or littoral owners, the common law as it then existed must control." (P. 479.) "We are aware of no statute of this State changing the common law, nor has there been

established any custom or usage which modifies the common law." (P. 484.)

What, then, is the common law in regard to the right of a riparian owner to build a wharf out from his upland into the waters of the lake?

In a note to *City of Madison* v. *Mayers*, 40 L. R. A. 635, the author treats the whole subject of the right to build wharves exhaustively. In England there were several adverse rights to be considered in determining whether or not a riparian owner had a right to construct a wharf. We need refer to but two in this discussion. There was the king's *jus privatum* in the soil covered by water, and there was the *jus publicum*, which was the right to have the water kept free from obstructions for the purpose of navigation. An interference with this latter right was a nuisance, and would be abated as such. It is stipulated in the case at bar that the appellant's wharf, if erected, would not obstruct, interfere with, burden or prevent navigation upon Lake Michigan. This question is therefore not in the case. An invasion of the king's *jus privatum*, or private property in the soil covered by water, was a purpresture. It is laid down by all the old writers that it might be committed either against the king, the lord of the fee or any other subject. A purpresture is not a nuisance unless it also interferes with navigation. It may be abated by the crown or the owner of the shore, or restrained by injunction at the suit of the Attorney General, whether it creates a nuisance or not. The remedy for the crown was either by an information of intrusion at the common law, or by an information at the suit of the Attorney General in equity. In case of a judgment upon an information of intrusion, the erection complained of, whether it was a nuisance or not, was abated. But upon a decree in equity, if it appeared to be a mere purpresture without being at the same time a nuisance, the court might direct an inquiry to be made whether it was more beneficial to the crown to abate the purpres-

202—28

ture or to suffer the erections to remain and be arrented. .
Lord Hale in Harg. Law Tracts, p. 85; Coulson & Forbes
on Waters, p. 15; Wood on Nuisances, sec. 84; Eden on
Injunctions, chap. 11; Story's Eq. Jur. sec. 922; Gould on
Waters, sec. 21; Angell on Tide Waters, p. 200; *Revell* v.
*People, supra; Shively* v. *Bowlby, supra,* and cases cited.

It has been generally recognized by the courts that
wharves are almost as essential to commerce as the
waterways themselves. The proceeding at the common
law to obtain leave to build a wharf on the king's tide
land was by a writ of *ad quod damnum* to ascertain what
injury would ensue. Upon the return of a favorable ver-
dict the proposed work was authorized by the king's
license. Without such a writ and a favorable inquisition
thereof, those who erected such purprestures did it at
their peril and took the risk of the structure being pro-
nounced a nuisance or abated. (Gould on Waters, sec. 21;
*Concord Manf. Co.* v. *Robertson,* 66 N. H. 1; *King* v. *Russell,* 6
B. & C. 566.) The language used shows that the owner
of the submerged soil, at common law, had the right to
say whether he would allow the owner of the adjoining
dry land to build out a wharf into the water on the soil
of the former, or not.

In *Storer* v. *Freeman,* 6 Mass. 435, it was said that one
of the earliest objects to which the settlers in Massa-
chusetts gave their attention was commerce. For this
purpose wharves erected below high-water mark were
a necessity. But the colony was not able to build them
at public expense. To induce persons to erect them the
common law of England was altered by ordinance, pro-
viding that the proprietors of land adjoining on the sea
should hold to low-water mark where the tide did not
abate more than one hundred rods. This was the ordi-
nance of 1647, commonly known as the "ordinance of
1641." *Commonwealth* v. *Alger,* 7 Cush. 53.

How the American colonies, the original States of
the Union, modified the common law to suit their needs,

both by custom and usage and by statute, is elaborately discussed by Mr. Justice Gray in *Shively* v. *Bowlby, supra,* and it would be a work of supererogation to review the ground he has so ably covered. His conclusion is: "There is no universal and uniform law upon the subject, but that each State has dealt with the lands under the tide waters within its borders according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public. Great caution, therefore, is necessary in applying precedents in one State to cases arising in another."

A number of American cases sustaining the right of the riparian owner to wharf out seem to be based on expressions as to the common law found in some of the English cases; others are really founded on the rule of the State extending the ownership of the riparian owner to the center thread of the stream. A large number of these cases merely determine the riparian owner's right of access, and the right to wharf out was not in controversy. The cases most generally relied on in this country to sustain this right are *Dutton* v. *Strong,* 1 Black, 23, *Railroad Co.* v. *Schurmeier,* 7 Wall. 272, *Yates* v. *Milwaukee,* 10 id. 497, and *Illinois Central Railroad Co.* v. *Illinois,* 146 U. S. 387. The authority of these cases has been substantially repudiated by *Shively* v. *Bowlby, supra,* in which it was said that none of the three cases first named called for the laying down or defining of any general rule, *independent of local law or usage* or of the particular facts before the court. Speaking of these cases this court said in *Revell* v. *People, supra* (p. 488): "If the three cases cited did not call for the laying down of a general rule independently of local law or usage in the States, as was held in the *Shively case,* the doctrine laid down in the *Illinois Central case* could not be predicated upon those cases. Moreover, we regard the rule established by the common law as

the safer and better doctrine, and as each State has the right to determine for itself the title and rights of riparian owners within its border, we regard it a better policy for all concerned to adhere to the common law rule, rather than follow the doctrine laid down in the *Illinois Central case.*"

In *Scranton* v. *Wheeler*, 179 U. S. 141, the only questions to be decided were the right of access to a navigable stream, and the owner's right to compensation when this right of access was injured or lost by any act of the general government in aid of navigation. In *Morris* v. *United States*, 174 U. S. 196, it was held that the claimants were not riparian owners, as a public street intervened between them and the river, and consequently there was no question of the extent of riparian rights to be decided. In the *Revell case* this court stated the rights of a riparian owner, at common law, to be the right to accretions and the right of access,—that is, the right to pass to and from the waters of the lake within the width of his premises as bordered on the lake, and then said (p. 484): "These are common law rights, and, as we understand the law, they are the only common law rights possessed by the shore owner. Other rights may have been conferred in different States by statute, usage or custom, but the question involved here is, whether such additional rights exist in this State." It is further said (p. 485): "Under the common law as declared in this case, [*Shively* v. *Bowlby*,] and it is fully sustained by the authorities, it is apparent that appellant, as owner of premises bounded on Lake Michigan, took no title to any submerged lands under the waters of the lake, nor did he, by virtue of being a shore owner, have any right to construct piers upon the submerged lands without the consent of the State." The question to be decided in the *Revell case* was, whether the riparian owner had the right to build piers out in the water in order to protect the shore of his lands from erosion. This right was denied, and the

court further said (p. 489): "As we understand the common law, any structure placed upon the land of the State below or beyond the water's edge in the waters of the lake is a purpresture, and may be abated in a proceeding instituted on behalf of the people."

After a careful reading of the authorities we see no reason to recede from the position taken in the *Revell case,* and are satisfied that by the common law, unmodified by local usage, custom or statute, a riparian owner had no right to build any structures on the submerged lands in front of his own land unless he owned such submerged lands or had a license to do so. The title of the owner of such submerged lands is not burdened with an easement in favor of the owner of the adjoining upland to build wharves out to navigable water. Such being the common law, it is the law of this State until altered by the legislature.

Appellant also claims that by virtue of the license from the Secretary of War he is entitled to build this wharf, because, as he says, a license from the executive officer of the government to build this wharf means permission and authority from the United States government to do so, and such permission and authority being granted, neither the State nor any of its agents have any control over the subject matter. He refers to the River and Harbor act of Congress of September 19, 1890, (26 Stat. at Large, chap. 907, p. 426,) as sanctioning his contention. Section 7 of this act was superseded by sections 9 and 10 of the River and Harbor act of March 3, 1899. (30 Stat. at Large, chap. 425, pp. 1121, 1151.) Section 10 of the latter act is as follows: "That the erection of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States, is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures, in any port, roadstead, haven, har-

bor, canal, navigable river or other water of the United States outside established harbor lines or where no harbor lines have been established, except on plans recommended by the chief of engineers and authorized by the Secretary of War; and it shall not be lawful to excavate or fill, or in any manner alter or modify, the course, location, condition or capacity of any port, roadstead, haven, harbor, canal, lake, harbor of refuge or enclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the chief of engineers and authorized by the Secretary of War prior to beginning the same." These provisions of the law were designed to protect the navigable waters of the United States from encroachment and from obstructions to navigation, and commit the duty of their protection to an officer of the general government, without whose permission no structures can be erected in them.

It is conceded that the power of Congress over the navigable waters of the country is derived from the commerce clause in the constitution of the United States, and that it is exclusive and paramount, whenever Congress has definitely spoken on any subject under its jurisdiction. It has been held by the Federal courts that when Congress has authorized the erection of a bridge it is not necessary to obtain the consent of the State authorities for its erection, and that no compensation need be made to the State for the use of its property in the lands under water, (*Stockton* v. *Baltimore and New York Railroad Co.* 32 Fed. Rep. 9,) and that an individual has no claim for compensation when the general government erects piers on his submerged lands in aid of navigation and thus cuts off his access to the water. (*Scranton* v. *Wheeler*, 179 U. S. 141.) But however that may be, we are of the opinion that the act prohibiting the erection of wharves without the consent of the Secretary of War is a mere regulation for the benefit of commerce and navi-

gation, and that the license or permission of the Secretary of War is only a finding and declaration of such officer that such proposed structure would not interfere with or be detrimental to navigation, and not that it is equivalent to a positive declaration by the authority of Congréss that the licensee may build the wharf or other structure without first obtaining the consent of the owner of the submerged land on which it is his purpose to build. Appellant not having, by the law of this State, the right to construct a wharf over his neighbor's submerged lands without his neighbor's consent, could not acquire that right, without his neighbor's consent, by obtaining a license from the Secretary of War.

We are further strengthened in this view by section 11 of the act of Congress of 1899, (a substantial re-enactment of section 12 of the act of 1890,) which authorizes the Secretary of War to establish harbor lines, beyond which no piers, wharves, bulkheads or other works shall be extended except under such regulations as may be prescribed from time to time by him. When harbor lines are established, no permit or license from the Secretary of War is necessary to build a wharf not extending beyond such lines. It certainly cannot be said that because the statute does not make a license necessary in such a case, a riparian owner can build his wharf within the harbor lines, in a State where the right to wharf out is not recognized, without the consent of the owner of the submerged land. The fixing of harbor lines is only a finding by an officer of the government that erections within such lines will not injure or interfere with navigation. If parties choose to build within such harbor lines the general government will not interfere. It is not a declaration touching the rights of the owners of the submerged lands in the harbor. When harbor lines are not established, or beyond established harbor lines, the permission of the general government to build a wharf in navigable waters is necessary. But such per-

mission is not given to override the rights of the owners of the submerged lands. It is, as said above, a declaration by the guardian of the interests of the public at large that the proposed structure will not interfere with navigation. It is strictly permissive, and not an authorization by paramount authority to build the structure.

The decree of the circuit court will be affirmed.

*Decree affirmed.*