## EAGLE INTERNATIONAL, INC. *v.* The CITY OF CROSSETT PORT AUTHORITY, CROSSETT, ARKANSAS

CA 88-285                    766 S.W.2d 28

Court of Appeals of Arkansas
Division I
Opinion delivered March 1, 1989

*Smith Law Firm, Ltd.,* by: *Richard L. Smith* and *Martha G. Hunt,* for appellant.

*Arnold, Hamilton & Streetman,* by: *Thomas S. Streetman,* for appellee.

JAMES R. COOPER, Judge. This appeal follows the entry of an

injunction against the appellant, Eagle International, Inc., by the Ashley County Chancery Court in an action brought by the City of Crossett Port Authority to force the appellant to move its two boats berthed in the Crossett Harbor turning basin.

At trial, the appellant asserted that a lease entered into between the parties permitted the berthing of the boats at the south side of the turning basin alongside the leased property and that a permit issued by the United States Army Corps of Engineers also provided the necessary authorization. On appeal, the appellant has abandoned its argument that the lease entitled it to berth the boats in the turning basin. Instead, it argues that, because the turning basin is part of the navigable waters of the United States, the only authorization required for it to berth its boats in the turning basin was granted by the United States Army Corps of Engineers in its permit. The Port Authority concedes that the Crossett Harbor turning basin is part of the navigable waters of the United States but asserts that it has concurrent authority over the turning basin.

The Port Authority owns approximately 130 acres along U.S. Highway 82 where it intersects the Quachita River, and it has constructed a ship channel and turning basin off the Quachita River. The Port Authority was created by an ordinance of the City of Crossett for the purposes of acquiring, equipping, and operating a port on the Quachita River at this site, which is five to six miles west of Crossett. At the eastern edge of the ship channel and turning basin is a five-lane concrete boat ramp which is owned by the Port Authority and is used for access to the Quachita River. Also located on the 130 acres is an elevated field area, seven to eight acres in size, on which the Port Authority is in the process of constructing a warehouse, public scales, and a wharf or dock in pursuit of its plan to operate a public port at the harbor. The Port Authority is also in the process of entering into a lease for the operation of a commercial marina at the harbor and has indicated that, after the marina is developed, people will be permitted to berth their boats there for a fee. With rare exception, the shoreline of the Quachita River in Ashley and Union Counties is under the management of the United States Fish and Wildlife Service, which does not allow boats to be berthed on the Ouachita River except with special permits of limited duration. At the time the complaint was brought, the United States Army Corps of

Engineers was in the process of constructing recreational improvements on lands owned by the Port Authority.

In late 1985 or early 1986, Jim Garner, an owner and vice president of the appellant, requested permission from the Port Authority to temporarily moor the appellant's boat, the Second Wind," referred to as a "party barge" by the Port Authority, at the harbor. The Port Authority gave the appellant permission to temporarily berth the boat at the harbor. The appellant later brought a second boat, the "Wimico," into the harbor and moored it alongside the other boat without permission from the Port Authority, which then notified the appellant that it must remove the boats from the harbor; after several requests, the appellant removed the boats for a few months in the fall of 1987 but brought them back to the harbor in 1988. Throughout the history of this dispute, the Port Authority has had a policy of not permitting any type of pleasure craft to be located on a permanent basis in the ship channel and turning basin.

On February 19, 1988, the Port Authority brought this action against the appellant and Glad Industries, Inc., for an injunction requiring them to remove the boats from the turning basin. Glad Industries was dismissed from the action after it was determined that it had no interest in the boats.

On May 23, 1988, the United States Army Corps of Engineers granted the appellant a permit to "place mooring dolphins and a floating dock" at the south side of the turning basin. The permit also granted after-the-fact authorization for an existing fifty-foot-long floating dock utilized by the appellant at the site. The permit stated, "[t]his permit does not obviate the need to obtain other Federal, state, or local authorizations required by law" and was expressly issued pursuant to Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. Section 403 (1986).

A decree was entered on June 13, 1988, granting an injunction directing the appellant to immediately remove the boats from the turning basin and restraining the appellant from bringing the boats into the turning basin in the future unless "it is in accordance with the rules and regulations adopted by the Crossett Port Authority for the general public use of those facilities." In the decree, the chancellor stated:

Eagle also contends that the Crossett Port Authority has no jurisdiction over the waters of the turning basin and ship channel. Eagle has submitted a brief citing numerous cases but those cases are not applicable to the facts in this case. The Crossett Port Authority has jurisdiction over the turning basin. The deed from the United States Army Corps of Engineers to the Port Authority, plaintiff's Exhibit 2C, specifically grants the Port Authority jurisdiction over the turning basin. However, the deed reserves unto the Corps of Engineers exclusive jurisdiction over the ship channel itself and provides that the Port Authority shall not impede public use of the ship channel. The Crossett Port Authority does not have jurisdiction over the ship channel. Only the United States Army Corps of Engineers has jurisdiction over the ship channel. However, the boats in question are berthed in the turning basin and not in the ship channel.

■ At trial, the chancellor stated that he did not consider the turning basin to be part of the "navigable stream of the Quachita River." The appellant has urged, and the Port Authority has conceded on appeal, that this finding is incorrect. The appellant argues that, therefore, the Port Authority cannot enjoin its berthing of the boats in the turning basin after the issuance of the permit by the United States Army Corps of Engineers. The Port Authority asserts that, although the turning basin is indeed part of the navigable waters of the United States, that fact does not warrant reversal of the chancellor's decision. The Port Authority argues that it still retains some power to regulate the use of the turning basin and has the authority to order the appellant to remove its boats. We agree. If the decision of the trial judge is correct for any reason, we will not reverse his decision. *Lyons* v. *Lyons*, 13 Ark. App. 63, 679 S.W.2d 811 (1984).

33 U.S.C. Section 403 (1986), under which the permit in the case at bar was issued, provides:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead,

jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

In Ark. Code Ann. Section 14-186-206 (1987), it is provided that "[t]he jurisdiction of a municipal port authority in any harbors, ports, or river-rail and barge terminals within the state shall extend over the waters and shores of the harbors or ports."

The permit issued by the United States Army Corps of Engineers gives appellant permission to place mooring dolphins and a floating dock at the south side of the turning basin. It does not give appellant permission to moor two boats in the turning basin, nor is it evidence that the United States Army Corps of Engineers has complete authority over the turning basin. The permit specifically states "[t]his permit does not obviate the need to obtain other Federal, state, or local authorization required by law."

In *Cummings* v. *Chicago*, 188 U.S. 410 (1903), the United States Supreme Court was asked to decide the question whether the appellants could proceed with the work on a dock in disregard of a Chicago ordinance requiring a permit because the plans for the dock were approved by the United States Engineer stationed at Chicago, and the permit was subsequently granted by the Secretary of War pursuant to Section 10 of the Rivers and Harbors Act of 1899. The Court stated:

We come now to the merits of the suit as disclosed by the bill. The general proposition upon which the plaintiffs base their right to relief is that the United States, by the acts of Congress referred to and by what has been done

under those acts, has taken "possession" of Calumet River, and so far as the erection in that river of structures such as bridges, docks, piers and the like is concerned, no jurisdiction or authority whatever remains with the local authorities. In a sense, but only in a limited sense, the United States has taken possession of Calumet River, by improving it, by causing it to be surveyed, and by establishing lines beyond which no dock or other structure shall be erected in the river without the approval or consent of the Secretary of War, to whom has been committed the determination of such questions. But Congress has not passed any act under which parties, having simply the consent of the Secretary, may erect structures in Calumet River without reference to the wishes of the State of Illinois on the subject.

188 U.S. at 426-27. In *Cummings*, the Court acknowledged that, if the power of the state and that of the federal government come in conflict, the power of the federal government will control.

■ Again, in *Wisconsin* v. *Illinois*, 278 U.S. 367 (1929), the Court, citing its earlier decision in *Cummings* v. *Chicago, supra*, stated: "[Section 10 of the Rivers and Harbors Act of 1899] was not intended to override the authority of the State to put its veto upon the placing of obstructing structures in navigable waters within a State and both State and Federal approval were made necessary in such case." 278 U.S. at 412.

■ The power of Congress over the navigable waters of the United States is clearly paramount whenever Congress has definitely spoken on the subject. We do not, however, agree with appellant's assertion that, having obtained the United States Army Corps of Engineers' permit, it can dispense with the need for the permission of the Port Authority in berthing its boats within the Crossett Harbor turning basin. The permit herein is only a finding that appellant's proposed mooring dolphins and floating dock will not interfere with or be detrimental to navigation, and it is not equivalent to a declaration that the appellant may proceed with mooring its boats in the Crossett turning basin without first obtaining the consent of the Port Authority. *Accord Cobb* v. *Lincoln Park Comm'rs*, 202 Ill. 427, 67 N.E. 5 (1903).

Affirmed.

JENNINGS and MAYFIELD, JJ., agree.