67 Cal.2d 408 (1967)
432 P.2d 3
62 Cal. Rptr. 401
COLBERG, INC., et al., Plaintiffs and Appellants,
v.
THE STATE OF CALIFORNIA EX. REL. DEPARTMENT OF PUBLIC WORKS, Defendant and Respondent. STEPHENS MARINE, INC., Plaintiff and Appellant,
v.
THE STATE OF CALIFORNIA EX REL. DEPARTMENT OF PUBLIC WORKS, Defendant and Respondent. (Consolidated Cases.)
Docket No. Sac. 7694.
Supreme Court of California. In Bank.
October 3, 1967.
*411 Daley, Patridge & Garrett, Richard B. Daley, Van Dyke & Shaw and James C. Van Dyke for Plaintiffs and Appellants.
Harry S. Fenton, Robert F. Carlson and Marc Sandstrom for Defendant and Respondent.
SULLIVAN, J.
These consolidated actions[1] for declaratory relief present the common issue whether plaintiff shipyard owners will have any causes of action for damages under the law of eminent domain arising out of the impairment of their access to the Stockton Deep Water Ship Channel as a result of the construction of two proposed fixed low level parallel bridges spanning a connecting navigable waterway to which their properties are riparian. Separate judgments on the pleadings in favor of defendant State of California were entered below and all plaintiffs have appealed.
[1] The record discloses that although the judgments were entered upon an order granting separate motions for judgment on the pleadings, defendant filed no answer in either case. Its motion therefore had the purpose and effect of a *412 general demurrer (2 Witkin, Cal. Procedure, p. 1706) and on review is to be tested by the same rules. (Dragna v. White (1955) 45 Cal.2d 469, 470 [289 P.2d 428]; Chas. L. Harney, Inc. v. Contractors' etc. Board (1952) 39 Cal.2d 561, 565 [247 P.2d 913].) [2] Since the motion was used to perform the function of a general demurrer, it "reaches only to the contents of the pleading and such matters as may be considered under the doctrine of judicial notice" (Weil v. Barthel (1955) 45 Cal.2d 835, 837 [291 P.2d 30]) and "admits all material and issuable facts pleaded." (Flores v. Arroyo (1961) 56 Cal.2d 492, 497 [15 Cal. Rptr. 87, 364 P.2d 263].) We proceed to set forth the facts in the light of these principles.[2]
The Stockton Deep Water Ship Channel is a navigable tidal waterway extending from the mouth of the San Joaquin River to the Port of Stockton. From the turning basin adjoining the port, the channel continues easterly for about 5,000 feet and comes to a dead end within the confines of the city. This portion of the waterway is known as the Upper Stockton Channel. Plaintiffs Colberg[3] and Stephens Marine, Inc. (Stephens), own real property in the City of Stockton riparian to the Upper Stockton Channel upon which for more than sixty years they have conducted shipyards for the construction and repair of yachts and ocean-going vessels. Both yards are improved with marineways, buildings, docks and allied facilities. Colberg's property consists of approximately eight acres; Stephens' of approximately six. Ships and other craft now using the Upper Stockton Channel can proceed to the turning basin and the Stockton Deep Water Ship Channel and thereupon navigate to the open sea by way of the Carquinez Straits and San Francisco Bay.
*413 The state proposes to construct twin stationary freeway bridges across the Upper Stockton Channel between plaintiffs' properties and the turning basin. The vertical clearance of these bridges is to be generally speaking, 45 feet above the water line. Pursuant to federal law the state applied to the Secretary of the Army and the Chief of Engineers for a permit to build such bridges. (See 33 U.S.C.A. § 525, subd. (b).) After a public hearing, consideration of the views of various interested persons including these plaintiffs, and an extensive economic survey, approval of the location and plans of the bridges was granted by federal authorities in February 1964, subject to conditions not here necessary to be detailed.
Colberg alleges that 81 percent of its current business involves ships standing more than 45 feet above the water line. Plaintiff Stephens alleges that 35 percent of its current business involves such ships. The present minimum clearance between plaintiffs' yards and the Pacific Ocean is 135 feet, established by the Antioch Bridge. Plaintiffs allege in substance that after the construction of the proposed bridges, no vessel with fixed structure in excess of 45 feet above the water line will be able to enter their respective shipyards; that there is no other access by water to the yards from the San Joaquin River, San Francisco Bay and the oceans of the world; and that plaintiffs, their properties and their businesses will suffer loss and damages because of the impairment of access resulting from the construction of the bridges.[4] Plaintiffs in both actions allege that an actual controversy exists (see Code Civ. Proc., § 1060) between each of them and the state as to whether the alleged impairment of access to "the main channel of the San Joaquin River" is compensable.
Counsel for the state pointed out to us at oral argument that a bridge of vertical clearance sufficient to accommodate plaintiffs' shipyard traffic would involve greatly increased construction costs because it would entail extended approaches;[5] that the added height of such approaches would have an *414 adverse effect upon intangible community values; and that a draw or swing bridge would be unsuitable for freeway purposes.
The trial court granted the state's motion for judgment on the pleadings in both cases and entered judgments accordingly. In its memorandum opinion it held that diminution of the scope of plaintiffs' access from their respective properties to the Stockton Deep Water Ship Channel as a result of the state's proposed action relative to its navigable waters would not constitute a taking or damaging of private property for which just compensation would be required.
[3] It is not disputed that an actual controversy exists between the parties on this question; that if plaintiffs were required to await construction of the bridge before commencing an action at law, they would suffer irreparable damage because of interference with their businesses during construction; that a declaratory judgment resolving the question of condensability in their favor prior to completion of the bridge project will permit relocation of their respective operations with a minimum of inconvenience; and that plaintiffs will be unable to plan their businesses or enter into necessary long-term business contracts, until such question is settled. We are satisfied that under the above circumstances plaintiffs were entitled to invoke declaratory relief.[6]
The sole question in this case is whether the alleged impairment *415 of plaintiffs' access to the Stockton Deep Water Ship Channel constitutes a taking or damaging of private property within the meaning of article I, section 14 of the California Constitution.[7] In order to answer this question we are led to an examination of the interest of the state in its navigable waters; in the course of this examination we explain the relationship between the state's power to deal with its navigable waters and the extent of its constitutional duty to make compensation for damage caused by the exercise of that power.
In order to put the controversy into proper focus, we must first make some preliminary observations concerning plaintiffs' position and the nature and extent of their claim. [4] First, it is clear that plaintiffs must assert the taking or damaging of a private right in order to bring themselves within the protective embrace of article I, section 14. Thus, they cannot ground their claim in the right of navigation, for this is a public right from the abridgment of which plaintiffs will suffer no damage different in character from that to be suffered by the general public.[8] (Jarvis v. Santa Clara Valley R.R. Co. (1877) 52 Cal. 438, 440; San Francisco Sav. Union v. R.G.R. Petroleum etc. Co. (1904) 144 Cal. 134, 139 [77 P. 823, 103 Am.St.Rep. 72, 1 Ann.Cas. 182, 66 L.R.A. 242]; Miller v. Mayor of New York (1883) 109 U.S. 385, 394-395 [27 L.Ed. 971, 974-975, 3 S.Ct. 228]; Frost v. Washington County RR. Co. (1901) 96 Me. 76, 85-86 [51 A. 806]; Marine Air Ways v. State of New York (1951) 201 Misc. 349, 350 [104 N.Y.S.2d 964] and cases there cited, affd. 280 App.Div. 1021 [116 N.Y.S.2d 778]; 56 Am.Jur., Waters, § 216, pp. 677-678.) Instead, they must have recourse to the private right of an owner riparian to a navigable waterway to have access to the channel. (See San Francisco Sav. Union v. R.G.R. Petroleum *416 etc. Co., supra, 144 Cal. 134, 139; Shirley v. Bishop (1885) 67 Cal. 543 [8 P. 82]; 56 Am.Jur., Waters, § 216, p. 677.) However, it appears that the access from plaintiffs' property to the navigable portion of the waterway to which they are riparian, to wit, the Upper Stockton Channel, will not be impaired by the proposed project, so that their private right of access, if limited to its traditional scope, will not be "taken or damaged" and no claim for compensation can arise. It is therefore plaintiffs' position that the private right of access must be expanded. They assert that the construction of the bridge in question will render their private right of access useless insofar as it pertains to vessels with a fixed structure more than 45 feet above the waterline; that after such construction they "can launch ships, but they can go nowhere." Action which renders a right valueless, they urge, effectively "takes or damages" that right.
We deem it unnecessary to decide this question, for we have determined that, whatever the scope of plaintiffs' right of riparian access as against other private persons, that right must yield without compensation to a proper exercise of the power of the state over its navigable waters. It is to a discussion of this latter power that we now turn.
[5] The State of California holds all of its navigable waterways and the lands lying beneath them "as trustee of a public trust for the benefit of the people." (People v. Gold Run Ditch & Min. Co. (1884) 66 Cal. 138, 151 [4 P. 1152, 56 Am.Rep. 80]; see also Martin v. Waddell (1842) 41 U.S. (16 Pet.) 367, 410 [10 L.Ed. 997, 1012]; Shively v. Bowlby (1894) 152 U.S. 1, 11-18 [38 L.Ed. 331, 336-338, 14 S.Ct. 548]; Eldridge v. Cowell (1854) 4 Cal. 80, 87; Ward v. Mulford (1867) 32 Cal. 365, 372; People v. California Fish Co. (1913) 166 Cal. 576, 584-585 [138 P. 79] and cases there cited; Henry Dalton & Sons v. Oakland (1914) 168 Cal. 463, 465, 467-468 [143 P. 721]; City of Long Beach v. Lisenby (1917) 175 Cal. 575, 579 [166 P. 333]; Atwood v. Hammond (1935) 4 Cal.2d 31, 40 [48 P.2d 20]; Katenkamp v. Union Realty Co. (1936) 6 Cal.2d 765, 769 [59 P.2d 473]; Miramar Co. v. City of Santa Barbara (1943) 23 Cal.2d 170, 174 [143 P.2d 1]; see generally 51 Cal.Jur.2d pp. 466-467, 508-509; 56 Am.Jur. pp. 698-699.) Its power to control, regulate and utilize such waters within the terms of the trust is absolute except as limited by the paramount supervisory power of the federal government over navigable waters. (Gray v. Reclamation *417 Dist. No. 1500 (1917) 174 Cal. 622, 637 [163 P. 1024]; see Shively v. Bowlby, supra, 152 U.S. 1, 26-31 [38 L.Ed. 331, 341-343]; United States v. Mission Rock Co. (1903) 189 U.S. 391, 404 [47 L.Ed. 865, 869, 23 S.Ct. 606].) [6] The nature and extent of the trust under which the state holds its navigable waterways has never been defined with precision, but it has been stated generally that acts of the state with regard to its navigable waters are within trust purposes when they are done "for purposes of commerce, navigation, and fisheries for the benefit of all the people of the state." (Mallon v. City of Long Beach (1955) 44 Cal.2d 199, 205 [282 P.2d 481]; see also People v. California Fish Co., supra, 166 Cal. 576, 584-585; City of Long Beach v. Lisenby, supra, 175 Cal. 575, 579 ("for purposes of navigation and commerce"); City of Long Beach v. Marshall (1938) 11 Cal.2d 609, 614 [82 P.2d 362] ("for navigation, commerce and fishing"); City of Newport Beach v. Fager (1940) 39 Cal. App.2d 23, 28 [102 P.2d 438]; People v. Hecker (1960) 179 Cal. App.2d 823, 840 [4 Cal. Rptr. 334].)
The courts have construed the purposes of the trust with liberality to the end of benefiting all the people of the state. In the early case of People ex rel. Board of State Harbor Comrs. v. Potrero & Bay View R.R. Co. (1885) 67 Cal. 166 [7 P. 445], defendant, under authority of a franchise granted by the Legislature, constructed a railroad bridge across Islais Creek, a navigable waterway. The bridge was an obstruction to navigation, and the Board of State Harbor Commissioners sought to have it abated as a nuisance. It was contended that the legislative act granting the right to build the bridge was in conflict with the act of Congress admitting California into the Union, which act provided that "`all the navigable waters within the State shall be common highways and forever free, as well to the inhabitants of said State as to the citizens of the United States, without any tax, impost, or duty therefor.'" This court rejected this contention, holding inter alia that "while the power of the State with respect to the construction, regulation, and control of bridges ... is subordinate to that of Congress, still until Congress acts on the subject, the power of the State is plenary." (67 Cal. at p. 168.) Though we there made no explicit reference to the extent of the trust relating to navigable waters, we impliedly held that the spanning of navigable waters by a railroad bridge was an act *418 within the trust purposes of "commerce, navigation, and fisheries."
In Boone v. Kingsbury (1928) 206 Cal. 148 [273 P. 797], the state surveyor-general had refused to issue to plaintiffs permits to prospect for oil and gas upon tidal lands covered by navigable sea waters upon the ground, inter alia, that the granting of such permits would constitute an act without the scope of the trust because such prospecting would not be "in aid and furtherance of commerce and navigation." We rejected that contention, holding that the relationship of gasoline to commerce was manifest. "Gasoline is the power that largely moves the commerce of nations over lands and sea; ... Gasoline is so closely allied with state and national welfare as to make its production a matter of state and national concern. If it can be said of any industry that its output is `in aid and furtherance of commerce and navigation,' and its production `a public benefit,' the production of gasoline, by reason of the motive elements that inhere in it and its universal use and adaptability to varied uses and the convenient and portable form in which it may be confined, would entitle it to a high classification in the scale of useful, natural products. It is a mover of commerce and fills the office of `a public benefit.'" (206 Cal. at p. 181.)
Finally, in the case of Gray v. Reclamation Dist. No. 1500, supra, 174 Cal. 622, plaintiffs sought to enjoin the operations of defendant district, which was engaged in efforts to reclaim land and prevent flooding, with incidental benefits to navigation, near the confluence of the Sacramento and Feather Rivers. We there rejected plaintiffs' contention that the state had no power to deal with its navigable waters unless its dominant purpose was to improve navigation. "The supreme control of the state over its navigable waters was early declared in Eldridge v. Cowell, 4 Cal. 80, approved in United States v. Mission Rock Co., 189 U.S. 391 [47 L.Ed. 865, 23 S.Ct. 606]. This right of control embraces within it not alone the power to destroy the navigability of certain waters for the benefit of others, but extends in the case of streams to the power to regulate and control the navigable or non-navigable tributaries, as in the debris cases, to the erection of structures along or across the stream, to deepening or changing the channel, to diverting or arresting tributaries; in short, to do anything subserving the great purpose, ..." (Italics added.) (174 Cal. at p. 636.)
*419 [7] We deem it too clear to warrant the citation of further authority that the state, as trustee for the benefit of the people, has power to deal with its navigable waters in any manner consistent with the improvement of commercial intercourse, whether navigational or otherwise. It is equally clear, however, that the question of governmental power is quite different from that of compensation for damage caused by the exercise of such power. It is to the latter question that we now turn.
[8] We have referred above to the paramount supervisory power of the federal government over navigable waters. This power, though superior to that of the state, is not grounded in ownership of the navigable waterways upon which it operates, but rather derives from the commerce clause of the United States Constitution, and it has been stated that it may properly be exercised only in order to aid navigation. (Port of Seattle v. Oregon & W.R.R. Co. (1921) 255 U.S. 56, 63 [65 L.Ed. 500, 506, 41 S.Ct. 237]; United States v. Kansas City Life Ins. Co. (1950) 339 U.S. 799, 808 [94 L.Ed. 1277, 1284, 70 S.Ct. 885]; see also United States v. River Rouge Improv. Co. (1926) 269 U.S. 411, 419 [70 L.Ed. 339, 345, 46 S.Ct. 144]; but see United States v. Twin City Power Co. (1956) 350 U.S. 222 [100 L.Ed. 240, 76 S.Ct. 259]; United States v. Commodore Park (1945) 324 U.S. 386, 391-392 [89 L.Ed. 1017, 1021-1022, 65 S.Ct. 803]; United States v. Gerlach Live Stock Co. (1950) 339 U.S. 725 [94 L.Ed. 1231, 70 S.Ct. 955, 20 A.L.R.2d 633]; see generally Morreale, Federal Power in Western Waters (1963) 3 Nat'l Resources J. 1, 9-19.) The Fifth Amendment to the United States Constitution[9] is of course applicable to the exercise of the federal navigational power within its proper scope, just as article I, section 14 of the state Constitution is applicable to the exercise of state power over navigable waters, but in many cases compensation for "damage" caused by exercise of the federal power is denied because the rights and values affected are deemed to be burdened with the so-called federal "navigation servitude."[10] *420 Among the rights so burdened is that of the access from riparian land to the affected navigable waterway. (Gibson v. United States (1897) 166 U.S. 269 [41 L.Ed. 996, 17 S.Ct. 578]; see Northern Transp. Co. v. Chicago (1878) 99 U.S. 635 [25 L.Ed. 336].) The limits of the servitude are reached, however, and just compensation must be paid in spite of the fact that the power has been exercised within its scope, when permanent physical encroachment upon or invasion of land riparian to the navigable waterway but above the ordinary high-water mark results. (See United States v. Chicago, M., St.P. & P.R.R. Co. (1941) 312 U.S. 592 [85 L.Ed. 1064, 61 S.Ct. 772]; United States v. Commodore Park, supra, 324 U.S. 386, 391 [89 L.Ed. 1017, 1021]; cf. United States v. Kansas City Life Ins. Co., supra, 339 U.S. 799; Pumpelly v. Green Bay etc. Co. (1871) 80 U.S. (13 Wall.) 166 [20 L.Ed. 557].)
As we have shown above, the power of the State of California to deal with its navigable waters, though subject to the superior federal power, is considerably wider in scope than that paramount power. The state, as owner of its navigable waterways subject to a trust for the benefit of the people, may act relative to those waterways in any manner consistent with the improvement of commercial traffic and intercourse. [9] We are of the further view that the law of California burdens property riparian or littoral to navigable waters with a servitude commensurate with the power of the state over such navigable waters, and that "when the act [of the state] is done, if it does not embrace the actual taking of property, but results merely in some injurious effect upon the property, the property owner must, for the sake of the general welfare, yield uncompensated obedience." (Gray v. Reclamation Dist. No. 1500, supra, 174 Cal. 622, 636.)
We have arrived at this conclusion after an examination of cases from other jurisdictions. It appears that in some states the servitude operates only when the state acts upon its navigable waters for the purpose of improving navigation, and that private rights "damaged" by acts not in aid of navigation are therefore compensable. (Beidler v. Sanitary Dist. (1904) 211 Ill. 628, 637 [71 N.E. 1118, 67 L.R.A. 820]; Natcher v. City of Bowling Green (1936) 264 Ky. 584, 592-593 [95 S.W.2d 255]; State ex rel. Andersons v. Masheter (1964) 1 Ohio St.2d 11, 12-13 [203 N.E.2d 325]; In re Construction of Walnut Street Bridge (1899) 191 Pa. 153 [42 A. 88]; *421 Conger v. Pierce County (1921) 116 Wash. 27, 31 [198 P. 377, 18 A.L.R. 393]; cf. Green Bay & Mississippi Canal Co. v. Kaukauna Water Power Co. (1895) 90 Wis. 370, 398 [61 N.W. 1121, 48 Am.St.Rep. 937, 28 L.R.A. 443]; Michaelson v. Silver Beach Improv. Assn., Inc. (1961) 342 Mass. 251 [173 N.E.2d 273, 91 A.L.R.2d 846].) This appears to be the law of the State of New York. (Marine Air Ways v. State of New York, supra, 201 Misc. 349, 350; Crance v. State of New York (1954) 205 Misc. 590, 593 [128 N.Y.S.2d 479], modified 284 App.Div. 750 [136 N.Y.S.2d 156], reinstated 309 N.Y. 680 [128 N.E.2d 324].)[11] Other jurisdictions hold as we do in the instant case, that the state's servitude operates upon certain private rights,[12] including those of access, whenever the state deals with its navigable waters in a manner consistent with the public trust under which they are held. (Lovejoy v. Norwalk (1930) 112 Conn. 199 [152 A. 210]; Frost v. Washington County R.R. Co., supra, 96 Me. 76, 85-87; Nelson v. DeLong (1942) 213 Minn. 425 [7 N.W.2d 342]; Crary v. State Highway Com. (1953) 219 Miss. 284, 293-296 [60 So.2d 468]; Darling v. City of Newport News (1918) 123 Va. 14 [96 S.E. 307, 3 A.L.R. 748], affd. 249 U.S. 540 [63 L.Ed. 759, 39 S.Ct. 371]; Milwaukee-Western Fuel Co. v. Milwaukee (1913) 152 Wis. 247 [139 N.W. 540].) We are of the opinion that this view is supported not only by the present law of California, but also by considerations of sound public policy.[13]
The limitation of the servitude to cases involving a strict navigational purpose stems from a time when the sole use of *422 navigable waterways for purposes of commerce was that of surface water transport. (See Morreale, op. cit., at p. 26.) That time is no longer with us. The demands of modern commerce, the concentration of population in urban centers fronting on navigable waterways, the achievements of science in devising new methods of commercial intercourse  all of these factors require that the state, in determining the means by which the general welfare is best to be served through the utilization of navigable waters held in trust for the public, should not be burdened with an outmoded classification favoring one mode of utilization over another.
[10] It is clear that the conclusions above expressed dispose of plaintiffs' contention that their right of access to the navigable waters fronting on their respective properties must, in order to be of utility, include the right to navigate freely to the sea.[14] Whatever the scope and character of their right to have access to those navigable waters,[15] we hold that such right is burdened with a servitude in favor of the state which comes into operation when the state properly exercises its power to control, regulate, and utilize such waters.
In City of Newport Beach v. Fager, supra, 39 Cal. App.2d 23, defendants' access to navigable waters over their littoral *423 land was wholly cut off when the city, a political subdivision of the state, filled and reclaimed the tidelands in front of their land. When the city sought to quiet title to the lands thus filled, defendants contended that they had at least a right of access over such lands to navigable water. The court rejected this contention. "We are satisfied that the correct rule is that the littoral owner of uplands upon a navigable bay has no right of access to the waters of the bay over intervening tide lands, whether filled or unfilled, which have been granted by the state to a city in trust for the purpose of improving such navigable bay in furtherance of commerce and navigation. [Citations.] Although it is true that as against a stranger a littoral owner of upland bordering upon navigable waters may not be deprived of his right of access to such waters,[[16]] no such right exists in favor of such littoral owner as against the state or its grantee in the exercise of a lawful use or purpose." (39 Cal. App.2d at p. 28; see also Henry Dalton & Sons Co. v. Oakland, supra, 168 Cal. 463, 467; People v. Hecker, supra, 179 Cal. App.2d 823, 840.) We are neither advised of, nor can conceive of, any reason why rules relating to one kind of navigable waters, to wit, tidewaters, should not be applied with equal reason to similar situations involving other kinds of navigable waters. [11] In any event, we take judicial notice of the fact that tidal influence extends some distance up the San Joaquin River past the Port of Stockton. (See Witkin, Cal. Evidence (2d ed. 1966) §§ 174-176, pp. 160-163.)
[12] We also reject plaintiffs' contention that our highway access cases (see Bacich v. Board of Control (1943) 23 Cal.2d 343 [144 P.2d 818]; Breidert v. Southern Pac. Co. (1964) 61 Cal.2d 659 [39 Cal. Rptr. 903, 394 P.2d 719]) require that compensation be paid for any substantial impairment of plaintiffs' right of access. We are not persuaded that the analogy between highway access and navigational access will bear close scrutiny. The right of access to a land highway *424 derives from the "land service road" concept, whereby roads are conceived of as arteries constructed through condemnation of private land for the purpose of serving other land abutting on them, rather than for the purpose of serving public traffic passing over them. (See Note (1965) 38 So.Cal.L.Rev. 689, 690, and authorities cited in fn. 9 thereof.) Principles applicable to such a right cannot reasonably be extended to the case of navigable waterways, which constitute a natural resource retained within the public domain for the purpose of serving public traffic in accordance with the greatest common benefit.
[13] Finally, we emphasize that the state servitude upon lands riparian or littoral to navigable waters, like the federal servitude burdening such lands, does not extend to cases wherein the proper exercise of state power results in actual physical invasion of or encroachment upon fast lands. In the case of Miramar Co. v. City of Santa Barbara, supra, 23 Cal.2d 170, plaintiff was the owner of lands littoral to a navigable bay and defendant, a political subdivision of the state, constructed a permanent breakwater in the bay about three miles to the west of plaintiff's property. The effect of this breakwater upon natural drifts and currents operated in the course of time to denude plaintiff's property of sandy beach, rendering the property valueless as a beach resort. It was alleged that defendant, before it built its breakwater, knew that the effect complained of would occur. Plaintiff sued in inverse condemnation, and the trial court entered a judgment of dismissal after sustaining defendants' demurrer without leave to amend. Upon affirmance of the judgment by this court it was said: "Plaintiff's littoral right to sandy water [which provided the accretion necessary to offset tidal washing], like its littoral right to access to the ocean, was derived entirely from the proximity of plaintiff's land to the ocean. It gave to plaintiff's land the advantage of sandy accretions. Nevertheless, the enjoyment of that advantage did not constitute a right to its perpetuation, for plaintiff's littoral rights were always subordinate to the state's right to improve navigation.[[17]] The duration of the sandy accretions depended entirely upon the continuation of the littoral right, which from the beginning was subject to termination by the state. The withdrawal *425 of the sandy accretions, constituting the damage to plaintiff's land, was an incidental consequence of the state's use of the public domain for a public interest that was at all times superior to private littoral rights. There has therefore been no taking or damaging of private property for public use within the meaning of article I, section 14, of the California Constitution." (23 Cal.2d at p. 176.) In a separate concurring opinion, it was said that direct physical encroachment or invasion upon plaintiff's lands was required in order that there be "a taking within the meaning of the constitutional provision." (23 Cal.2d at p. 178.) After reference to certain cases of the United States Supreme Court to which we have adverted above (e.g., Pumpelly v. Green Bay Co., supra, 80 U.S. (13 Wall.) 166) the concurring opinion concluded that "The doctrine of taking under the Fifth Amendment has never been extended beyond the rule stated, and certainly there is no necessity for doing so under a constitutional provision which provides compensation for both taking and damaging." (23 Cal.2d at pp. 178-179.) Three justices of the court dissented upon the basis that under the facts a physical taking of the plaintiff's land was involved.
It therefore appears that this court in the Miramar case, though divided as to the proper result under the facts there at issue, reached fundamental agreement on the extent to which the state, through the proper exercise of its trust power to deal with navigable waters, may impair without compensation rights appurtenant to property riparian or littoral to such waters. [14] The servitude with which such property is burdened precludes compensation for impairment or curtailment of all rights not damaged by permanent physical invasion of or encroachment upon fast lands; when the exercise of the power does cause such physical invasion or encroachment, the servitude is inapplicable and rights damaged as a result are compensable in accordance with article I, section 14, of the state Constitution.
[15] We hold that plaintiffs' right of access from their respective riparian properties to the waters of the channel, whatever its scope as against private parties, is burdened with a servitude in favor of the state and that, since there is here no direct physical invasion of, or encroachment upon, said properties by the state, plaintiffs are not entitled to compensation for the abridgment or diminution, if any, of such right *426 of access as a result of the lawful exercise of the state's power to regulate, control and deal with its navigable waters.
The judgments are, and each of them is affirmed.
Traynor, C.J., McComb, J., Tobriner, J., and Burke, J., concurred.
PETERS, J.
I dissent.
I cannot agree that because the state wants to build two low-level highway bridges across the mouth of an inlet where plaintiffs' shipyards are located, plaintiffs must suffer the complete loss caused by the impairment of their right of one-way water access to deep water. Principles of fairness, logic and public policy suggest that this loss is a part of the cost of the freeway that should not be borne by plaintiffs but should be borne by the public. Compensation should therefore be allowed.
The access impaired here is one-way access to the oceans of the world. Such access is indispensable to the operation of plaintiffs' businesses.[1] So, the impairment is not technical. It is substantial and different in nature and degree from the impairment suffered by the general public. There is not involved the mere hypothetical damage to vacant land, nor are we dealing with speculators, nor with newly created businesses. Both plaintiffs have been operating bona fide shipyards in the inlet for over 60 years. Thus, we are not involved with a mere incidental impairment of the right of access but are dealing with a very substantial impairment. The impairment is not caused by a construction strictly in aid of navigation but the bridges are part of a state freeway. If the freeway impaired land access to the same degree such impairment would be compensable. These facts are indisputable.
The majority hold that, under these facts, case law and public policy dictate the conclusion that compensation should not be allowed. So far as case law is concerned the majority have done a commendable job in collecting the cases discussing the nature of the rights involved. But all that this exhaustive analysis proves is that there are no definitive cases in California, and that the decisions of other states reach *427 conflicting results. A decision either way is permissible under the cases. Thus, the decision in this case is really a public policy one, and the majority, recognizing this, claim that public policy supports their conclusion. How can there be a public policy to cut off plaintiffs' only access to deep water and so put well established businesses out of operation without compensation? The answer is obvious. There can be and is no such public policy. The question is not an open one. It has been decided that, as a matter of public policy, impairment of land access under such circumstances requires compensation. The majority fly in the face of that determination.
Today government is big and complex and constantly growing bigger. The legitimate need of government for property is constantly expanding. Thus, more and more frequently, the rights of individuals and the government come into conflict. When this occurs then this court must referee the conflict and try to protect the rights of the state and the rights of the individual. In doing so we must keep in mind the admonition of our Constitution that property "shall not be taken or damaged for public use without just compensation."[2]
Nowhere is this conflict between the state and the individual made more apparent than by the state's need to build new highways and freeways which frequently include, as here, the building of bridges. The problem became very apparent in the construction of the freeways and the approaches leading to the San Francisco Bay Bridge. Rights of access were obviously impaired. In the case of Bacich v. Board of Control, 23 Cal.2d 343 [144 P.2d 818], where the construction of the approaches to the Bay Bridge placed plaintiff's land and property in a cul-de-sac, the problem was directly presented. Plaintiff had still one-way access to the general system of streets but his access in the other direction was substantially cut off. There was no controlling case in California. Cases elsewhere were in conflict. The court recognized that it was a problem of first impression, and that it was required to determine the public policy of this state. It then showed no hesitancy, as it does now, to declare such policy. It held that when the right of access was impaired, as distinguished from a physical taking or damaging, there must be a weighing of *428 the conflicting rights. Thus, where the impairment is substantial and peculiar to the plaintiff, and can be compensated for without prohibitive cost, it is compensable. But where the impairment is incidental and where the cost of compensation is prohibitive it is not compensable. Thus, impairment of access to one in a cul-de-sac was held compensable, but property owners beyond the next intersecting street were not to be compensated. Nor were property owners to be compensated where their access street was made into a one-way street or into a divided highway, or left turns were prohibited. (See Bacich v. Board of Control, supra, 23 Cal.2d 343, particularly the concurring opinion of Edmonds, J., p. 356, 358 et seq.; Breidert v. Southern Pac. Co., 61 Cal.2d 659 [39 Cal. Rptr. 903, 394 P.2d 719]; Valenta v. County of Los Angeles, 61 Cal.2d 669 [39 Cal. Rptr. 909, 394 P.2d 725].) The court showed no reluctance in Bacich and the other cases in declaring that a material impairment of the right of access should be compensable as a matter of public policy. But the majority in the instant case repudiate that public policy and purport to hold that public policy now compels a contrary result. The two lines of authority are inconsistent and incompatible. If we were right in the land access cases the majority are wrong in this case.
The major error in the majority opinion is its holding that all the state's uses of its navigable waters must be treated in the same identical fashion. It may be that when the state acts strictly in aid of navigation that the right of the state is absolute and the property owner is entitled to no compensation (Miramar Co. v. City of Santa Barbara, 23 Cal.2d 170 [143 P.2d 1]) for impairment of his rights. But where the use by the state is not strictly for navigation purposes, but, as here, is for freeway purposes, principles of equity, justice, fairness, and certainly of public policy, dictate that the same public policy declared in the land access cases should apply.
When this case was before the Court of Appeal of the Third Appellate District, Justice Friedman prepared a scholarly and exhaustive opinion for the court that discusses these positions in depth. The following portions of that opinion are adopted as part of this dissent. (Colberg, Inc. v. State of California (Cal. App.) 55 Cal. Rptr. 159.)
"The amendment of state constitutions, including California's, to provide compensation when private property is `damaged' as well as `taken' for public use, indicates an *429 intent to expand the area of compensability, requiring the courts to fix its limits by placing the economic interests of the public in balance against the sacrifices imposed on the landowner. (Bacich v. Board of Control, 23 Cal.2d 343, 350-351 [144 P.2d 818]; concurring opinion of Edmonds, J. ibid., pp. 358-360, 144 P.2d pp. 826-832; see Albers v. County of Los Angeles, 62 Cal.2d 250, 262-263 [42 Cal. Rptr. 89, 398 P.2d 129].) The case-by-case balancing of these competing interests results in judicial expansion or contraction of a group of intangible rights recognized as compensable `private property.' Compensable property, it is now recognized, includes not only the physical land and improvements but certain intangible rights of access between the land and the outside world. Thus, although the owner uses the streets in common with the rest of the public, he owns a private easement of access which consists of the right to get into the street abutting his property and thence to the general system of public streets and highways. (Valenta v. County of Los Angeles, 61 Cal.2d 669, 671 [39 Cal. Rptr. 909, 394 P.2d 725]; Breidert v. Southern Pac. Co., 61 Cal.2d 659, 663 [39 Cal. Rptr. 903, 394 P.2d 719], citing preceding California decisions; cf. Sneed v. County of Riverside, 218 Cal. App.2d 205 [32 Cal. Rptr. 318], re airspace invasion.) Not every impairment of access to the general system of public streets is compensable in eminent domain. Compensability, rather, requires an individualized finding of substantial impairment, a finding of fact delegated to the trial court and not the jury. (Breidert v. Southern Pac. Co., supra, 61 Cal.2d at pp. 663-665 [39 Cal. Rptr. 903, 394 P.2d 719]; People v. Ricciardi, 23 Cal.2d 390, 402-403 [144 P.2d 799].)
"The central problem is to locate a line between compensable damage to private property and disadvantages of the kind called `consequential.' Of the latter sort are such elements as loss of business and diminution of traffic caused by diversion of traffic and circuity of travel. (People ex rel. Department of Public Works v. Symons, 54 Cal.2d 855, 860 [9 Cal. Rptr. 363, 357 P.2d 451].) Applying the economic balancing test, the Supreme Court points out that awards of the latter sort would severely burden the public treasury and produce `"an embargo upon the creation of new and desirable roads."' (Ibid., p. 862, 9 Cal. Rptr. p. 367, 357 P.2d p. 455.)
"The street access doctrine represents an expanded notion of the constitutional concept of private property whose invasion *430 or damage is compensable in eminent domain. It means that `property' in an eminent domain sense includes not only a piece of the earth's surface but an intangible right of movement between it and the outside world; that, although the channels of movement are shared with the public, they are `private' and compensable when a public improvement devalues a particular piece of land by substantially impairing these channels. Navigable waterways are channels of movement no less than streets and highways. (See Chicago, etc. Ry. v. City of Minneapolis, 232 U.S. 430, 442, [58 L.Ed. 671, 675, 34 S.Ct. 400]; Wattson v. Eldridge, 207 Cal. 314, 320 [278 P. 236]; People v. Gold Run Ditch & Min. Co., 66 Cal. 138, 147 [4 P. 1152, 56 Am.Rep. 80].) There is no difference in principle or policy between land and sea access which affirms an easement of access by land and denies it by water. If a public project obstructs the owner's access to the outside world, he is equally hurt whether the barrier blocks him by land or by sea. A littoral property owner's easement of access includes both media of movement.
"Claims for loss of street access often arise because the public improvement places private property on a cul-de-sac, restricting accessibility to one direction only, e.g., Valenta v. County of Los Angeles, supra; Bacich v. Board of Control, supra. The Colberg and Stephens shipyards are situated on a natural cul-de-sac. Without the intervention of the public improvement, they have marine access to the outside world in one direction only. According to the complaints, construction of the public project will obstruct much of the single marine route between their property and the outside world. Their private right of access to the navigable water in front of their property has little value if that is as far as they can go.[5] Location on a partially blocked, marine cul-de-sac is one element in the group of circumstances indicating the occurrence or absence of a substantial impairment of the easement of access.
"Doubtless these shipyards have street access on the landward side. Shoreline properties have obvious economic attributes resulting from their accessibility by water. Residual access by land may supply scant economic solace when marine access beyond the immediate waterfront is obstructed or *431 destroyed. The substantial impairment rule supplies a criterion for determining whether the retention of land access and the destruction or obstruction of marine access result in compensable damage.
"The state contends that the street access doctrine is only an analogy. It suggests that the public policy of the street access cases, where economic balancing is possible, does not apply to loss of marine access; that the public can supply economical alternative routes to compensate for closed streets but not for closed waterways; further, that a bridge of limited clearance across a busy waterway may elicit damage claims so heavy and widespread as to prevent the project. These factors evoke no policy considerations excluding access by water from the general easement of access recognized in eminent domain. The balancing approach is much broader than the street access cases. It is employed to measure the reach of the policy underlying the eminent domain provision of the state Constitution, laying down a line which separates compensable injuries from noncompensable disadvantages. In Albers v. County of Los Angeles, supra, it is used in the context of a landslide damage claim; in Clement v. State Reclamation Board, 35 Cal.2d 628, 642 [220 P.2d 897], to determine compensability of flood damage. In the course of the latter decision the court states: `The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.' (Clement v. State Reclamation Board, supra, 35 Cal.2d at p. 642 [220 P.2d at p. 905].)
"Viewed in the light of the economic balancing criterion, the present injuries are sharply focused on two properties. They arouse no concern for the public purse beyond that involved in any eminent domain proceeding. While shared with the general public, marine passage along Upper Stockton Channel without a height restriction is a unique economic attribute to two commercial shipyards located on a marine cul-de-sac.[6] The prospect of damage claims from the two owners is not so monumental as to discourage the freeway project of which the bridges are a part. The taxpayers can absorb the cost with far less hardship than the owners. (Albers v. *432 County of Los Angeles, supra, 62 Cal.2d at p. 263 [42 Cal. Rptr. 89, 398 P.2d 129].)
"The selection between a low level bridge and reasonable alternatives is essentially a budgetary and planning choice by the administrator. Potential damage to the littoral owners may approach the cost of raising the bridge level. At that point the administrator starts thinking of an acceptable alternative, for example, a higher bridge. Intangible community values imperiled by the extended ramps of a high bridge may impel his return to the low level design. Whatever motivates the administrator to choose a low level bridge, dollars or intangible community values, the individual property owner `if uncompensated would contribute more than his proper share to the public undertaking.' (Clement v. State Reclamation Board, supra, 35 Cal.2d at p. 642 [220 P.2d at p. 905].)
"The specter of widespread damage claims caused by a bridge athwart a busy artery of marine commerce arouses no policy tremors. Potential economic injuries from obstructions to navigation are limited by federal statutes investing the Chief of Engineers and the Secretary of the Army with discretionary permit powers in the interest of protecting navigation. (See 33 U.S.C. §§ 401, 403; Ryan v. Chicago, B. & Q.R.R. Co., 59 F.2d 137, 142.) Unless the federal officials abdicate their responsibilities, a low level, drawless bridge across the Carquinez Straits or the mouth of the Mississippi is a theoretical but not practical possibility. It is reasonable to suggest that the present bridge project merited a federal permit only because the 45-foot limitation on navigation had narrow economic impact on two shipyards located on a marine cul-de-sac; that at some point potential injury to additional maritime interests would provoke denial of a federal permit. Injury claims remaining after the federal screening must then pass a second screening, that imposed by the economic balancing test, which measures the limit of compensability under the California Constitution. Finally, the claim must pass the substantial impairment test. These successive filters prevent compensable injuries to navigation so widely diffused that they are more public than private.
"We resist the invitation to follow the nuisance and equity decisions which deny upstream owners relief against downstream bridges which obstruct navigation. (See cases cited fn. 4, supra.) [Fn. 4. Gilman v. Philadelphia, 70 U.S. (3 Wall.) *433 713 [18 L.Ed. 96]; Miller v. City of New York, 109 U.S. 385 [27 L.Ed. 971, 3 S.Ct. 228]; Cardwell v. American River Bridge Co., 113 U.S. 205 [28 L.Ed. 959, 5 S.Ct. 423]; Pacific Inter-Club Yacht Assn. v. Morris, 197 F. Supp. 218; Jarvis v. Santa Clara Valley R.R. Co., 52 Cal. 438; People v. Potrero & Bay View R.R. Co., 67 Cal. 166 [7 P. 445]; cf. Hickok v. Hine, 23 Ohio St. 523 [13 Am.Rep. 255]; see also Sound Marine & Machine Corp. v. Westchester County, 100 F.2d 360.] Such decisions turn largely on the `public' character of the right of navigation and the private plaintiff's lack of standing to seek relief against a public nuisance not peculiar to himself. In the search for an eminent domain concept of `private property,' equity and nuisance decisions are not a trustworthy guide (see Clement v. State Reclamation Board, supra, 35 Cal.2d at p. 641 [220 P.2d 897]). Preferable to analogies drawn from other branches of the law is the self-contained `easement of access' doctrine developed as part of the California law of eminent domain.
"Eminent domain decisions in other states on compensability of obstructions to navigation vary. The variation is often prompted by the language of the particular state's constitutional provision. In Pennsylvania, where the Constitution was amended to provide compensation for property `injured' as well as taken, a wharf owner was awarded damages when a city bridge prevented vessels from passing upstream to his wharf. (In re Construction of Walnut Street Bridge, 191 Pa. 153 [43 A. 88], reported sub nom. Gumbes v. City of Philadelphia, 191 Pa. 153 [43 A. 88].) In State ex rel. Andersons v. Masheter, supra, where the Ohio Constitution limited compensation to a `taking,' the court denied recovery under similar facts. One of the Ohio judges dissented, believing that the riparian terminal operator had developed a private right of navigation which was separate from that of the public and was `taken' from him by the bridge.[7] In New York a similar claim was denied on the theory (imported from the equity and nuisance decisions) that the right of navigation is `exclusively a public right.' (Marine Air Ways v. State, supra, 201 Misc. 349, 104 N.Y.S.2d at p. 967, affd. 280 App.Div. 1021, 116 N.Y.S.2d 778.) The Florida courts have adopted the same rationale. (Moore v. State Road Dept., supra (Fla.App.) 171 So.2d 25; Carmazi v. Board of County *434 Comrs., supra (Fla.App.) 108 So.2d 318.) None of these decisions considered the easement of access doctrine evolved as part of the California law of eminent domain. None of them considered the balancing of policies implicit in the easement of access doctrine.
"Both sides seek support in City of Los Angeles v. Aitken, 10 Cal. App.2d 460 [52 P.2d 585]. The action was one to condemn littoral rights on a navigable lake whose level would be lowered by the condemning agency's diversion of tributary streams. The defendant owned shoreline resort property. According to the opinion, the marginal owner's privilege of boating was not itself compensable, but constituted an element in the valuation of his shoreline property. The case supplies no precedent here, since it involves a destruction of the littoral owner's private right of access to navigable water directly fronting on his property.
"The second major question is posed by the doctrine denying compensation when a littoral owner's interests in navigable water are damaged through the exercise of the `navigation servitude,' that is, through the public's paramount power to control navigable waters in the interest of navigation and commerce. (See generally Miramar Co. v. City of Santa Barbara, supra, 23 Cal.2d 170 [143 P.2d 1]; 2 Nichols [on Eminent Domain (3d ed.)] op. cit., pp. 247-258.) The state relies upon cases which seemingly extend the doctrine to public improvements which aid commerce as well as those aiding navigation. (Henry Dalton & Sons Co. v. Oakland, supra, 168 Cal. 463, 467 [143 P. 721]; City of Newport Beach v. Fager, supra, 39 Cal. App.2d at p. 28 [102 P.2d 438].) It points out that the proposed bridges are part of an interstate freeway project which will improve access to Stockton harbor and benefit land and water transportation.
"Broad dicta in some of the decisions permit identification of the navigation servitude with the promotion of `commerce' without express restriction to waterborne commerce. Such statements should not be taken out of context. Decisional law rejects the notion that any project facilitating commerce is ipso facto within the sovereign power over waterways. Nor do the parallel powers of the federal and state governments over navigation include every public project affecting the navigable capacity of water. Although most generalizations entail some peril, the general tenor of the decisions is that the navigation servitude is limited to public works designed to aid or *435 control navigation, excluding projects for other purposes.[8] A leading case refers to the navigation servitude as one embracing `such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation.' (Scranton v. Wheeler, 179 U.S. 141, 163 [45 L.Ed. 126, 137, 21 S.Ct. 48].) Freeways and streets along the waterfront are outside the scope of the navigation servitude (In re City of New York, 168 N.Y. 134 [61 N.E. 158, 56 L.R.A. 500]; In re Jamaica Bay, 256 N.Y. 382 [176 N.E. 539]; Crance v. State, supra, 205 Misc. 590 [128 N.Y.S.2d 479]) although there is contrary authority (Crary v. State Highway Com., 219 Miss. 284 [68 So.2d 468]). Deepening the channel of a stream to prevent overflows harmful to roads and bridges is not an exercise of the navigation power. (Conger v. Pierce County, 116 Wash. 27 [198 P. 377, 18 A.L.R. 393].) The proposed freeway bridges across the Upper Stockton Channel will not aid its development as a medium of commerce. Rather they will obstruct its navigability, albeit the obstruction will be sanctioned by federal law. (See Southlands Co. v. City of San Diego, 211 Cal. 646 [297 P. 521].)
"The state seeks to extend the navigation servitude on the strength of decisions permitting improvements on publicly owned tidelands without compensation for the upland owner's loss of access, e.g., Miramar Co. v. City of Santa Barbara, supra, 23 Cal.2d 170 [143 P.2d 1]; Henry Dalton & Sons Co. v. Oakland, supra, 168 Cal. 463 [143 P. 721]; City of Newport Beach v. Fager, supra, 39 Cal. App.2d 23 [102 P.2d 438]. In those cases the public's immunity is said to extend not only to tideland projects promoting navigation but to any `lawful use or purpose.' (People v. Hecker, 179 Cal. App.2d 823, 840 [4 Cal. Rptr. 334]; City of Newport Beach v. Fager, supra, 39 Cal. App.2d at p. 28 [102 P.2d 438].) The tideland cases turn upon the principle that the littoral rights of an owner whose land adjoins publicly owned tidelands may be terminated by whatever disposition of the tidelands the public *436 chooses to make. (Miramar Co. v. City of Santa Barbara, supra, 23 Cal.2d at p. 174 [143 P.2d 1].) Although public tidelands are held in trust for commerce, navigation and fishery, projects on tidelands may have nothing to do with navigation. Subject to the restrictions in statutory grants, public tidelands may be devoted to any use which does not prejudice the public rights of navigation and fishing. (Mallon v. City of Long Beach, 44 Cal.2d 199, 206 [282 P.2d 481]; Boone v. Kingsbury, 206 Cal. 148, 183, 189 [273 P. 797].) Thus the public's power to improve its tidelands without compensating littoral owners is not a measure of the navigation servitude when tideland use is not involved.
"Finally, the state urges that the federal permit to construct the low level bridge project across Upper Stockton Channel is `conclusive.' Perhaps it is, in the limited sense that a court may not restrain an obstruction to navigation permitted by federal law. (See cases cited fn. 4, supra.) The permit is only a declaration of federal assent, not a delegation of power.[9] Federal assent to the project does not shield the state from the eminent domain provision of its own constitution. `It must be remembered ... that damage may be inflicted within the meaning of such a constitutional provision by the mere exercise of unquestioned public rights.' (2 Nichols, op.cit., p. 265.)
"We conclude that the bridge project is not an exercise of the state's navigation servitude; that the project will cause compensable damage to plaintiffs' private properties if, in an appropriate proceeding, a court finds substantial impairment of their respective easements of access."
For these reasons I believe the judgments should be reversed.
Mosk, J., concurred.
Appellants' petition for a rehearing was denied November 1, 1967. Peters, J., and Mosk, J., were of the opinion that the petition should be granted.
NOTES
[1] The trial court granted defendant's motion for consolidation of both actions "for hearing and trial." Appellants have prepared a single record on appeal but filed separate briefs.
[2] In each action the court made and filed findings of fact and conclusions of law. Since the granting of each motion had the effect of an order sustaining a general demurrer and since there was no "trial of a question of fact by the court" (Code Civ. Proc., § 632), there was nothing to find. The findings of fact and conclusions of law were not required and we have disregarded them. (Taylor v. Palmer (1866) 31 Cal. 240, 257; Bradley Co. v. Ridgeway (1936) 14 Cal. App.2d 326, 330 [58 P.2d 194]; see also Flynn v. Flynn (1951) 103 Cal. App.2d 91, 96-97 [229 P.2d 5]; Lunsford v. Kosanke (1956) 140 Cal. App.2d 623, 631-632 [295 P.2d 432].)
[3] In the Colberg action plaintiffs are Colberg, Inc., a California corporation, Wilton Colberg, Jack Colberg and Gordon Colberg, co-partners, doing business as Colberg Boat Works. Colberg, Inc. operates the shipyard under a lease from the partnership and owns the equipment and personal property utilized in such operation. Hereafter, unless otherwise indicated, we refer to all of the said plaintiffs collectively as Colberg.
[4] Colberg alleges that its property "will be totally lost and destroyed"; and that it is "the only shipyard facility which lies on the Upper Stockton Channel that relies principally upon the repair and construction of large vessels for its income." Stephens alleges that as a result of the construction of the bridges, its shipyard "can only be operated at substantial loss to the plaintiff and the value of plaintiff's property will be substantially diminished."
[5] Colberg alleges on information and belief that the state "has determined the comparative costs of the bridges at different levels, including structure, roadway, and right of way acquisitions to be as follows:

"50 foot vertical clearance above mean sea level: $27,448,000.00
"63 foot vertical clearance above mean sea level: $38,724,000.00
"100 foot vertical clearance above mean sea level: $46,398,000.00
"No estimate of cost has been made by the defendant for a bridge 135 feet above mean sea level"; further alleges that "the determination of the defendant to construct said bridges with a vertical clearance of 50 feet above mean sea level, and to construct them without facilities for a lift type or draw-bridge type bridge, has been made solely upon considerations of economy and the advantages to motor vehicle traffic safety and utility, and not upon any consideration to improve navigation. Plaintiffs further allege that said bridges are an obstruction to navigation and do not improve navigation in any manner whatsoever."
[6] "The demands of commerce and of modern life generally impose a necessity for security in legal relations. That implies not only that the immediate present be stabilized, but that planning for the future may be possible. Such planning requires the opportunity to ascertain and to determine the effect of relations and events certain or practically certain to arise in the future." (Borchard, Declaratory Judgments (2d ed. 1941) pp. 414-415; see Sattinger v. Newbauer (1954) 123 Cal. App.2d 365, 367 [266 P.2d 586]; Staley v. Board of Medical Examiners (1952) 109 Cal. App.2d 1, 5-6 [240 P.2d 61]; Knox v. Wolfe (1946) 73 Cal. App.2d 494, 505 [167 P.2d 3]; University of Redlands v. Ford (1942) 56 Cal. App.2d 151, 153 [132 P.2d 238].)
[7] "Private property shall not be taken or damaged for public use without just compensation having first been made to ... the owner, ..." (Cal. Const., art. I, § 14.)
[8] Indeed, plaintiffs, while scrupulously eschewing all claims based on a public right, have been forced into the position of extending a private right in a meandering continuum from their properties to the Pacific Ocean and, as counsel for the state observed at oral argument, now claim a property right in "a column of air 135 feet high extending from their properties to the sea." We cannot refrain from observing that were the bridge here involved proposed for the Carquinez Straits instead of the Upper Stockton Channel, plaintiffs, consistently with the theory of their pleadings, would advance the same basic claim for compensation. If such claim could be considered valid for plaintiffs, it would also be assertible by the countless riparian owners in the intervening section of the watercourse.
[9] "... nor shall private property be taken for public use, without just compensation." (U.S. Const., Amend. V.)
[10] There is some doubt as to the origin and basis of the dominant navigational servitude in favor of the federal government. Perhaps the most satisfactory explanation is that derived from the common law concept of jus publicum, that interest of the Crown in its navigable waterways whereby the subjects were assured that such waterways would be utilized for public benefit, and that private interference with such utilization would be prevented. (See Morreale, op cit., at pp. 19-31.)
[11] We observe that New York cases antedating the Marine Air Ways case did not appear to construe the servitude so narrowly as did that case and those following it. (See Sage v. Mayor of City of New York (1897) 154 N.Y. 61, 76 [47 N.E. 1096, 61 Am.St.Rep. 592, 38 L.R.A. 606]; Tiffany v. Town of Oyster Bay (1922) 234 N.Y. 15, 21 [136 N.E. 224, 24 A.L.R. 1267]; Matter of City of New York (Jamaica Bay) (1931) 256 N.Y. 382, 389 [176 N.E. 539].)
[12] No case has been found denying compensation when the act of the state upon its navigable waters results in actual taking of or encroachment upon fast lands. (See Natcher v. City of Bowling Green, supra, 264 Ky. 584; Morrison v. Clackamas County (1933) 141 Ore. 564 [18 P.2d 814]; Conger v. Pierce County, supra, 116 Wash. 27.)
[13] "[E]ach State has dealt with the lands under the [navigable waters] within its borders according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public. Great caution, therefore, is necessary in applying precedents in one State to cases arising in another." (Italics added.) (Shively v. Bowlby, supra, 152 U.S. 1, 26 [38 L.Ed. 331, 341].)
[14] It should be noted that the "private property" right upon which plaintiffs base their claims is of even larger scope than a simple right to navigate freely to the sea, for that right is not here curtailed except insofar as it concerns ships with fixed structures more than 45 feet above the waterline. Thus, the "right of access" claimed by plaintiffs would seem to include a right to navigate to the sea in vessels of any size. (See fn. 8, infra.)
[15] As noted above (see fn. 11 and accompanying text) the State of New York appears to limit the scope of the state's servitude to those cases where the state's act is in furtherance of navigation, and requires compensation for damage to private rights occasioned by acts not in furtherance of navigation. However, in a case whose facts are similar to those at bench, the New York court construed those facts and characterized the right at issue as that of navigation, rather than access. Since, as we have indicated above, the right to navigate is a public rather than a private right, the court held that its abridgment was noncompensable even though the governmental act complained of was not undertaken in aid of navigation. (Marine Air Ways v. State of New York, supra, 201 Misc. 349; cf. Crance v. State of New York, supra, 205 Misc. 590.) Other jurisdictions have adopted a similar approach. (State ex. rel. Andersons v. Masheter, supra, 1 Ohio St.2d 11; see also Frost v. Washington County R.R. Co., supra, 96 Me. 76; Carmazi v. Board of County Comrs. (Fla.App. 1959) 108 So.2d 318; Moore v. State Road Dept. (Fla.App. 1965) 171 So.2d 25.) We do not adopt this rationale in the instant case. The rationale we do adopt leaves open the question whether as against private persons, a riparian owner's right of access connotes a right of some scope to move freely upon the surface of navigable water once the channel has been attained.
[16] It is this right as against private persons which is the basis of cases involving condemnation of land fronting on navigable waterways. (See City of Los Angeles v. Aitken (1935) 10 Cal. App.2d 460 [52 P.2d 585]; cf. United States v. Chandler-Dunbar etc. Co. (1913) 229 U.S. 53 [57 L.Ed. 1063, 33 S.Ct. 667]; United States v. River Rouge Improv. Co., supra, 269 U.S. 411.) The right of access, though defeasible by appropriate governmental action, has value to the owner of riparian or littoral property, and this right must be valued in light of a realistic estimate of the chance that the government would exercise its power to diminish or curtail it.
[17] The improvement involved in Miramar was in aid of navigation. However, as we have explained supra, the state's power to regulate and control its navigable waters is not limited to purposes of navigation, and the servitude in its favor is of commensurate scope.
[1] Colberg alleges that 81 percent of its current business is derived from ships unable to reach its shipyard under a bridge but 45 feet in height. Stephens alleges it will lose 35 percent of its business if the bridges are built. The Carquinez bridges, it should be mentioned, are 135 feet above the water.
[2] Article I, section 14 of our state Constitution. See also article XV, section 1 of that Constitution which provides "The right of eminent domain is hereby declared to exist in the State to all frontages on the navigable waters of this State."
[5] "At this point we paraphrase the majority opinion in Bacich v. Board of Control, supra, 23 Cal.2d at p. 354 [144 P.2d at p. 825], which states: `To be able to get onto the street immediately in front of the property is of little value if that is as far as [the owner] can go.'"
[6] "At this point we refrain from anticipating the computation of damage and from indicating the relationship between loss of business and devaluation of property."
[7] "Cf. Miramar Co. v. City of Santa Barbara, 23 Cal.2d 170, 183 [143 P.2d 1], dissent of Carter, J."
[8] "United States v. River Rouge Improv. Co., supra, 269 U.S. at p. 419 [70 L.Ed. 339, 345, 46 S.Ct. 144]; United States v. 50 Foot Right of Way in Bayonnc, 337 F.2d 956, 959; United States v. 412.715 Acres of Land, 53 F. Supp. 143, 149; City of Los Angeles v. Aitken, supra, 10 Cal. App.2d at p. 470 [52 P.2d 585]; Crance v. State, 205 Misc. 590 [128 N.Y.S.2d 479, 481], reversed on other grounds 309 N.Y. 680 [128 N.E.2d 324]; 26 Am.Jur.2d, Eminent Domain, § 191, p. 870; Note: 18 A.L.R. 403."
[9] "Cummings v. City of Chicago, 188 U.S. 410, 430-431 [47 L.Ed. 525, 531-532, 23 S.Ct. 472]; Pembroke v. Peninsular Terminal Co., 108 Fla. 46 [146 So. 249, 255]; Cobb v. Lincoln Park Comrs., 202 Ill. 427 [67 N.E. 5, 9, 63 L.R.A. 264]; Wilson v. Hudson County Water Co., 76 N.J. Eq. 543 [76 A. 560, 565-566]; Sullivan v. Booth & Flinn, 210 App.Div. 347, [206 N.Y.S. 360, 363]."