[No. D006230. Fourth Dist., Div. One. Nov. 14, 1988.]

LAWRENCE S. GRAF et al., Plaintiffs and Appellants, v. SAN DIEGO UNIFIED PORT DISTRICT, Defendant and Respondent.

**COUNSEL**

Larry Byron Croyle and Leo Shaw for Plaintiffs and Appellants.

Jennings, Engstrand & Henrikson and C. Michael Cowett for Defendant and Respondent.

**OPINION**

**STANIFORTH, J.***—Plaintiff Lawrence S. Graf is the owner of a boat anchored at Fort Emory Cove, South San Diego Bay and is founder and

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

president of the Fort Emory Cove Boat Owners Association. He and his fellow boatowners received notice posted on their boats of a violation of San Diego Unified Port District (Port District) Ordinance No. 1200. The notice, posted by the harbor police, declared the vessels remaining in or entering the area after March 16, 1987, would be subject to citation and/or impound by the Port District Harbor Patrol.

Graf and his fellow boatowners also received further notice posted on their boats declaring they had "until August 1, 1987 to vacate the area" and if their boats remained in Fort Emory Cove after August 1, 1987, they "shall be subject to enforcement procedures." The notices warned that "a violation of Ordinance No. 1200 is a misdemeanor and is the subject of criminal penalties." Criminal citations have been issued as to at least seven members of the boatowners association. Their cases are now pending in the municipal court.

Graf, on behalf of himself and the other boatowners, filed this action in the superior court seeking declaratory and injunctive relief. The trial court issued a temporary restraining order enjoining the enforcement of the ordinance. After a noticed hearing and argument the court dissolved the temporary restraining order and denied Graf's motion for a temporary injunction. The court concluded Graf had not "met [his] burden of establishing a likelihood of prevailing on a trial on the merits." Graf appeals, contending Port District Ordinance No. 1200 is unconstitutional and void.

## FACTS

Fort Emory Cove is in the southwest corner of San Diego Bay. It is a 500 foot by 1,000 foot anchorage dredged to a depth of 8 feet with a 200-foot-wide entrance channel dredged to 7 feet. This dredging was completed in 1944 by the United States Corps of Army Engineers and was used in World War II as a refueling and service area for seaplanes. The floor of the bay in this area, excepting the excavated dredged portion, varies from one to two feet in some locations or as much as four to eight feet in depth. As part of a study by the Port District there was a bayside small craft mooring and anchorage plan (anchorage plan) developed. This plan selected eight anchorage areas in Central and North San Diego Bay but it prohibited anchorage in South San Diego Bay because of its findings the South San Diego Bay was extremely shallow, making any anchorages in that area very dangerous to those vessels anchored there. Many vessels had become grounded or abandoned there and required removal by the Port District at considerable expense. The study of the tides and currents showed there was very little water circulation in the South San Diego Bay area. As a result, pollution generated by the vessels anchored there was greatly intensified.

The anchorage plan was an amendment to the Port District master plan and was adopted by the Port District and certified by the coastal commis-

sion in 1980. The Port District also retained an environmental consultant to prepare an environmental impact report (EIR) to study the proposed anchorage plan in accordance with federal and California Environmental Quality Act (CEQA) requirements. The draft EIR was prepared on May 2, 1984, and presented to the port commissioners. By resolution No. 84-303 the commissioner certified the final EIR and made findings determining its adequacy in directing the staff to file a notice of determination. The port commissioners then approved the amended master plan and incorporated the anchorage plan by resolution No. 84-303. Finally in 1985 the port commissioners accepted the coastal commission certification and thereby made the anchorage plan an official part of the Port District's certified coastal plan.

During the Port District's study of anchorage on the bay, the United States Coast Guard had by its own rules (33 C.F.R. § 110.210(a)) continued to treat the entire San Diego Bay as a federal anchorage. Following the adoption of the anchorage plan and its certification by the California Coastal Commission, the Port District requested the Coast Guard to revise its regulation of anchorages in San Diego Harbor by disestablishing the entire harbor as an anchorage and by promulgating regulations providing that anchorages established by the Coast Guard were consistent with the anchorages established by the Port District. The Coast Guard agreed to so modify its regulation and on March 13, 1986, the Coast Guard published proposed rules in Federal Register volume 51, No. 49, page 8687. Thereafter a public hearing was held and after hearing the Coast Guard published its new rules and regulations. (51 Fed.Reg. 19752-19754 (June 2, 1986).) These rules were adopted by the Coast Guard pursuant to its authority in title 33 United States Code section 471. They are consistent with the anchorage plan adopted by the Port District. Thus the jurisdiction to establish and enforce the anchorage and nonanchorage areas in San Diego Harbor is concurrent. The Coast Guard recognizes the right of the San Diego Port District to establish these anchorages and enforce the provisions of the anchorages by ordinance and to punish violators by enforcing criminal laws against them.

In implementing this master plan on February 10, 1986, the port commissioners adopted ordinances Nos. 1200 and 1201. Ordinance No. 1200 implemented the anchorage plan by making it unlawful to anchor, moor, make fast to the bottom, strand or ground vessels or other structures in South San Diego Bay. This ordinance became section 4.30 of the Port District Code. Ordinance No. 1201 established two anchorages in Central San Diego Bay to the north, recognized additional federal anchorages in the bay and prohibited anchoring or mooring in Central San Diego Bay except in the cited anchorage. Thus the master plan divides San Diego Bay into three sections, South San Diego Bay, Central San Diego Bay and North San

Diego Bay. There are no designated anchorages in South San Diego Bay but there are three designated anchorages in Central San Diego Bay.

## DISCUSSION

### I

■ In determining whether to issue a temporary injunction, the trial court should evaluate two interrelated questions: (1) are the plaintiffs more likely to suffer greater injury from the denial of the injunction than the defendants are likely to suffer from its grant; and (2) is there a reasonable probability that the plaintiffs will prevail on the merits? (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 206 [211 Cal.Rptr. 398, 695 P.2d 695]; *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889].) By balancing the respective equities of the parties, the trial court should conclude that pending a trial on the merits a defendant should or should not be restrained from exercising the right claimed by him. Granting or denying the preliminary injunction does not constitute an adjudication of the ultimate rights of parties in the controversy. (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].) When a trial court denies an application for preliminary injunction, it has implicitly determined the plaintiff has failed to satisfy either or both of these requirements.

■ On appeal, the question becomes whether the trial court has abused its discretion in ruling on both factors. Even if the appellate court concludes the trial court abused its discretion as to one of the factors, it nevertheless may affirm the trial court's order if there has been no abuse of discretion as to the other. A different standard does not apply in reviewing an application for preliminary injunction where, as here, the validity of challenged legislation presents only a question of law.

Some appellate courts have applied the two part test where the grant of preliminary injunctive relief was only a facial attack on local regulations. (Cf. *EWAP, Inc.* v. *City of Los Angeles* (1979) 97 Cal.App.3d 179 [158 Cal.Rptr. 579] and *7978 Corporation* v. *Pitchess* (1974) 41 Cal.App.3d 42 [115 Cal.Rptr. 746].) Other Courts of Appeal have adhered to the abuse of discretion review standard where the trial court has denied the application for a preliminary injunction by a plaintiff challenging a statute as unconstitutional. (Cf. *American Booksellers Assn., Inc.* v. *Superior Court* (1982) 129 Cal.App.3d 197 [181 Cal.Rptr. 33].)

In *Cohen* v. *Board of Supervisors, supra,* 40 Cal.3d at page 289, where there had been a denial of a petition for a preliminary injunction, the Court of Appeal had failed to make the abuse of discretion analysis. Instead it determined no material question of fact was in issue and then proceeded to evaluate the challenge on the merits. The Supreme Court retransferred this

case to the Court of Appeal for an opinion as to whether the trial court abused its discretion in implicitly finding for the city on the interim harm and likelihood of prevailing on the merits. The Supreme Court stated at page 290: "Such a disposition is 'appropriate to assure that complex and substantial issues raised on appeal are initially considered by the Court of Appeal before their presentation to us, thereby providing the parties a more complete form of appellate review.' [Citation.]" Following the direction from the Supreme Court, we must look to see whether there is an abuse of discretion by the trial court in its analysis of one or both of the factors.

## II

Graf contends the Port District may not adopt penal legislation by virtue of article XI, section 7 of the California Constitution which provides "[a] *county or city* may make and enforce within its limits all local, police, sanitary and other ordinances and regulations not in conflict with general laws." Graf relies on two inapposite cases, *In re Werner* (1900) 129 Cal. 567 [62 P. 97] and *Gilgert* v. *Stockton Port District* (1936) 7 Cal.2d 384 [60 P.2d 847]. In *Werner,* a zoning ordinance adopted by the Stockton Port District made zoning violations subject to penal sanctions. Although within the statutory authority conferred upon the Port District, the appeal court held the ordinance exceeded the Port District's constitutional authorities. In *Gilgert,* the court relied upon the earlier decision in *Werner* saying, "For the purpose of local legislation certain functions may be conferred upon and exercised by various political subdivisions existing under our complex system of self-government, but we cannot believe either the people [*sic*] or the legislature [*sic*] intended to bestow upon such agencies the power to declare penalties for the violation of the many and varied rules and ordinances they might see fit to enact." (*Gilgert* v. *Stockton Port District, supra,* 7 Cal.2d at pp. 390-391.) Finally the *Gilgert* court said: "There is no doubt but what the legislature has power to delegate to a port commission authority to make reasonable rules and regulations for the administration of any branch of the state's business pertinent to the functions of the commission or board, but *no such board or commission may declare a violation of such rules or regulations, when so established, to be a crime.*" (*Id.* at p. 392, italics added.) Whether the foregoing principles from *Werner* and *Gilgert* may be sound law, need not be questioned by this court at this time. They simply are not applicable to the facts of this case. The Legislature had not made a violation of the *Werner* or *Gilgert* rules to be a misdemeanor.

The controlling authority in this case is *People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480 [96 Cal.Rptr. 553, 487 P.2d 1193]. The court in *Younger,* after careful analysis of the *Werner* and *Gilgert* decisions, held an agency created by the state Legislature, the governing board of which was composed of appointed representatives of member agencies,

could adopt an ordinance, the *violation of which was a misdemeanor pursuant to the legislative enactment establishing that agency.* (*Id.* at pp. 496-498.) In the Counties of El Dorado and Placer, a member agency of the Tahoe Regional Planning Agency challenged the power of that agency to collect funds to run the agency from the county because the powers exceeded the power of the Legislature under article II, section 11 of the California Constitution.

The Supreme Court rejected the county's assertion, holding the regional agency did have such powers including the power to adopt ordinances the violation of which would constitute a misdemeanor. It so held because in *Younger,* unlike *Werner* and *Gilgert, the Legislature specifically stated the violations of the agencies' ordinances would constitute misdemeanors.* The *Younger* court declared: "The Agency is given the power to 'adopt all necessary ordinances, rules, regulations and policies to effectuate the adopted regional . . .' plan." (5 Cal.3d at p. 488.) The statute also provided " '[v]iolation of any ordinance of the [A]gency is a misdemeanor.' (§ 66801, art. VI, subd. (f).)" (*Ibid.*)

The *Younger* court discussed *Werner* and *Gilgert* at length and distinguished each case saying, "Certain broad language in *Werner* and *Gilgert* appears to support the proposition that no power to make regulations having a local effect may be conferred upon public corporate bodies not enumerated in section 11. (See Brooks, *The Metropolis, Home Rule and the Special District,* Part II (1960) 11 Hastings L.J. 246, 256-259.) However, *Werner* and *Gilgert involved only the power to enact penal ordinances, and they have consistently been interpreted as forbidding only the delegation of power to prescribe penalties for violations of ordinances. (Rible* v. *Hughes* (1944) 24 Cal.2d 437, 450 [150 P.2d 455, 154 A.L.R. 137] (Carter, J., dissenting); *L.B. Foster Co.* v. *County of Los Angeles* (1968) 265 Cal.App.2d 24, 27-28 [71 Cal.Rptr. 16]; *Moore* v. *Municipal Court* (1959) 170 Cal.App.2d 548, 555-557 [339 P.2d 196]; 10 Ops.Cal.Atty.Gen. 47, 48-49 (1947); 16 Ops.Cal.Atty.Gen. 6, 8-9 (1950); 27 Ops.Cal.Atty.Gen. 134, 138 (1956) Peppin, *Municipal Home Rule in California: III* (1944) 32 Cal.L.Rev. 341, 358-360.) Thus in *Moore, supra,* the court said: '[*W*]*e recognize that the Legislature may not delegate to a subordinate administrative body the power to promulgate rules and regulations coupled with the power to fix the penalty for their violation.* The power to fix the penalty cannot be fragmentized without the danger that multiple administrative agencies may impose different sanctions for the same violation. The Legislature must retain the prerogative of the definition of the penalty because its distribution to various agencies could cause disparate and inequitable punishment for identical offenses. But so long as the Legislature determines the penalty it may leave the administrative body the actual making of the multiple rules called for by the specific subject matter regulated.' (*Id.* at p. 556.)

"The instant case is clearly distinguishable from *Werner* and *Gilgert* since the Legislature has not delegated to the Agency the power of enacting penal legislation. It is the Legislature itself which has properly declared that: 'Violation of any ordinance of the agency is a misdemeanor.' (§ 66801, art. VI, subd. (f).)" (*People* ex rel. *Younger* v. *County of El Dorado, supra,* 5 Cal.3d at p. 496, italics added.)

The *Younger* decision is further in point in finding the powers conferred upon the agency were regional in nature and not for local purposes. Here, the Port District is clearly a regional district in the same sense. It is composed of five cities none of which controls the bay properties operated by the Port District and each of which has appointed representatives on the board. As the *Younger* court concluded in distinguishing *Werner* and *Gilgert,* since the powers conferred upon the agency are for regional purposes, not local purposes, and since no power to enact penal legislation has been delegated to the agency, former section 11 is not violated. Thus *Werner* and *Gilgert* are inapplicable. (5 Cal.3d at p. 498.) ■ The Supreme Court has held an agency created by state statute may be delegated the power to make ordinances and regulations, but it is the state Legislature which provides the violation of such ordinance shall constitute a misdemeanor. This may be done in complete conformity with the California Constitution.

■ Here, the Legislature has not delegated that constitutional power to the Port District but has itself created and authorized that penalty in enabling legislation found in section 59 of the San Diego Unified Port District Act (Deering's Ann. Harb. & Nav. Code (1978 ed.) Appen. I, p. 579). Section 59 provides: "Any person who violates the provisions of any ordinance, or any local policy or sanitary regulation, of the board shall be guilty of a misdemeanor. The prosecution shall be conducted by the City Attorney of San Diego if the infraction occurred within the corporate limits of the City of San Diego on lands or waters subject to the jurisdiction of the district. The prosecution shall be conducted by the District Attorney of San Diego County if the infraction occurred without the corporate limits of the City of San Diego but otherwise on lands or waters subject to the jurisdiction of the district."

The Port District was authorized to adopt all ordinances and resolutions including Ordinance No. 1200 to carry out its duties. Section 21 of the act provides: "The board may pass all necessary ordinances and resolutions for the regulation of the district." More specifically, section 55 provides in part: The board shall "(b) Regulate and control the anchoring, mooring, towing and docking of all vessels." Thus, California's Legislature has delegated to the Port District its power as trustee over the tidelands and submerged lands of the San Diego Bay within the Port District boundaries and declared a violation of its ordinances to be misdemeanors.

## III

■ Graf next contends Ordinance No. 1200 is unconstitutional as a total prohibition of use as distinguished from a mere regulation of use, citing *People* ex rel. *Younger* v. *County of El Dorado* (1979) 96 Cal.App.3d 403, 406 [157 Cal.Rptr. 815] (not the same case discussed above). Graf contends a citizen's right of access to navigable waters is a constitutional right which cannot be totally prohibited.

Graf recites the history of the tidelands and submerged lands. The people have owned the right to these lands for purposes of commerce, navigation and fishing from Roman law times onward. When California was admitted to statehood in 1850 it acquired title to the navigable waterways and tidelands within its waters, not in a proprietary capacity but as trustee for the people. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 482 [91 Cal.Rptr. 23, 476 P.2d 423].) California and its political subdivisions hold "all of its navigable waterways and lands lying beneath them" as trustees of a public trust for the benefit of the people. (*Colberg Inc.* v. *State of California* ex rel. *Dept. Pub. Works* (1967) 67 Cal.2d 408, 416 [62 Cal.Rptr. 401, 432 P.2d 3].) Graf argues the basic purpose of entrusting tidelands to municipalities in trust was to ensure the right of free public access to tidelands or navigable waters. The object of the trust would be destroyed, he asserts, if a municipality in the exercise of its municipal powers can deprive the people of their right of access to the tidelands or navigable waters. It is sound law that municipal powers must be exercised in consonance with the trust duties and these powers may not be used to destroy the trust obligations. Graf argues the right to anchor is included within the definition of navigation, citing *Marks* v. *Whitney* (1971) 6 Cal.3d 251, 259 [98 Cal.Rptr. 790, 491 P.2d 374]. Graf contends the district may regulate the use of the navigable waters under the guise of controlling pollution but it may not prohibit their use.

There are a number of problems with the *Younger* case (the Court of Appeal case) if sought to be applied. The ordinance here does not prohibit all long-term anchorage on the bay but rather implements a comprehensive master plan to designate where anchorages are to be permitted and where anchorages are to be prohibited. Graf simply ignores the comprehensive provision for anchorage areas in the bay and the prohibition of anchorage only in one small area of the bay. Equally inapplicable cable is the case of *Lane* v. *City of Redondo Beach* (1975) 49 Cal.App.3d 251 [122 Cal.Rptr. 189], where the City of Redondo Beach sought to foreclose all public access to the city's adjoining tidelands by forming a redevelopment agency which encompassed virtually all of the city's coastline. The court held the city was obligated to fulfill the trust powers pursuant to the tidelands grant. (*Id.* at p. 257.) The Port District's acts here are completely distinguishable. The

issue is not access to but rather regulation of navigable waters. In *Lane* the city was not exercising its trust powers to regulate or control navigable waters, but rather to extinguish public access to these waters. Here, there is no allegation that the Port District has foreclosed the public use of the tidelands by any act or enactment.

Finally, Graf fails to take account of the fundamental right, authority and power of the state to regulate and utilize its navigable waterways and lands lying beneath them. The court in *Marks* v. *Whitney, supra,* 6 Cal.3d at page 260, said the power of the state to control, regulate and utilize its navigable waterways and lands lying beneath them when acting within the terms of the trust is absolute except as limited by the paramount supervisory power of the federal government over navigable waters.

In *Colberg, Inc.* v. *State of California,* ex rel. *Dept. Pub. Wks., supra,* 67 Cal.2d 408, the court examined the interest of the state in its navigable waters, explaining the "relationship between the state's power to deal with its navigable waters and the extent of its constitutional duty to make compensation for damage caused by the exercise of that power." (*Id.* at p. 415.) The court stated: "The State of California holds all of its navigable waterways and the lands lying beneath them 'as trustee of a public trust for the benefit of the people.' [Citations.] Its power *to control, regulate and utilize such waters within the terms of the trust is absolute except as limited by the paramount supervisory power of the federal government over navigable waters.* [Citations.] The nature and extent of the trust under which the state holds its navigable waterways has never been defined with precision, but it has been stated generally that acts of the state with regard to its navigable waters are within trust purposes when they are done 'for purposes of commerce, navigation, and fisheries for the benefit of all the people of the state.' [Citations.]" (*Id.* at pp. 416-417; italics added.)

The *Colberg* court, after examining several cases, held the right to control navigable waters includes the power to *destroy the navigability of certain waters so as to promote the great purpose.* (67 Cal.2d at p. 418.) The court stated: " 'This right of control embraces within it not alone the power to destroy the navigability of certain waters for the benefit of others, but extends in the case of streams to the power to regulate and control the navigable or non-navigable tributaries, as in the debris cases, *to the erection of structures along or across the stream,* to deepening or changing the channel, to diverting or arresting tributaries; *in short, to do anything subserving the great purpose,* . . .' [Citation.]" (*Ibid.,* italics in original.)

Here, it is clear the Port District regulation of anchorage in the bay is part of a comprehensive master plan. It permits anchorages in other designated portions of the bay. Restricting portions in a limited area is a proper

exercise of the powers under its enabling act pursuant to which the Port District regulates the public trust over navigable waters. The fact that Graf may be inconvenienced or that his vessel may be rendered of less value, does not constitute a taking or damaging of the property or an improper exercise of the Port District's powers of trust of these waters. The restriction on the docking of vessels in this portion of the bay must be viewed in light of the greater purpose for which the trust is held.

## IV

Graf in his reply brief seizes upon yet another legal theory seeking to provide a basis for reversal of the trial court's decision. Having been put on notice of section 59 of the Port District Act, an act of the Legislature declaring violations of the Port District's ordinances to be misdemeanors, he now argues section 59 is obviously "vague and ambiguous." A number of cases he cites are sound fundamental law. There is a constitutional prohibition against vaguely worded criminal statutes, yet the cases cited have no applicability here. Section 59 is as plain and clear as any language can be. *"Any person who violates the provisions of any ordinance . . . shall be guilty of a misdemeanor."* (Italics added.) Provision for prosecution by either the city attorney or the district attorney, depending on where the event occurred, in no way imparts vagueness or any unconstitutional factors.

For each of the foregoing reasons we conclude there has been no abuse of discretion in the decision of the trial court denying a preliminary injunction. Applying either the test "are the plaintiffs more likely to suffer greater injury from the denial of the injunction than the defendants are likely to suffer from its grant" or the test "is there a reasonable probability that the plaintiffs will prevail on the merits," no abuse of discretion is shown.

## Disposition

Judgment affirmed.

Kremer, P. J., and Todd, J., concurred.