[No. D013673. Fourth Dist., Div. One. July 1, 1992.]

LAWRENCE S. GRAF et al., Plaintiffs and Appellants, v.
SAN DIEGO UNIFIED PORT DISTRICT, Defendant and Respondent.

**COUNSEL**

John B. Barriage for Plaintiffs and Appellants.

Jennings, Engstrand & Henrikson, C. Michael Cowett and Arlene Prater for Defendant and Respondent.

Daniel E. Lungren, Attorney General, Richard M. Frank, Acting Assistant Attorney General, and Jamee Jordan Patterson, Deputy Attorney General, as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**FROEHLICH, J.**—In this appeal we determine that the San Diego Unified Port District (Port District) did not exceed its jurisdiction in establishing certain areas in the San Diego Bay for mooring and anchoring boats and in prohibiting these activities in other areas of the bay. We also decide that Port District's regulation of mooring and anchorage in the San Diego Bay comports with California constitutional requirements.

### FACTUAL AND PROCEDURAL BACKGROUND

On February 10, 1987, Port District enacted Ordinance 1200, which added section 4.30 to the Port District Code, and Ordinance 1201, which added section 4.35 to the Port District Code. Section 4.30, subdivision (c) of the

code prohibits anchoring, mooring, making fast to the bottom, stranding or grounding a vessel or structure within South San Diego Bay.[1] Section 4.35 of the code establishes areas where anchoring or mooring is permitted in Central San Diego Bay and prohibits anchoring, mooring, making fast to the bottom, stranding or grounding a vessel or structure within Central San Diego Bay[2] except within areas where permitted.

The ordinances were enacted as a result of a bayside small craft mooring and anchorage plan developed for San Diego Bay as part of a study by Port District. The mooring and anchorage plan was adopted by Port District as an amendment to its master plan and was certified by the coastal commission in 1980. After preparation and certification of an environmental impact report on the plan, the port commissioners accepted the coastal commission's certification and also accepted the anchorage plan as an official part of Port District's certified coastal plan.

After adoption of the mooring and anchorage plan, the United States Coast Guard deleted the previous establishment of all of San Diego Harbor as an anchorage ground. This action made room for Port District to designate certain mooring and anchorage areas, consistent with the federal scheme. (51 Fed. Reg. 8687, 8688.)[3] Port District then enacted Ordinances 1200 and 1201 designating certain areas for anchorage or mooring and prohibiting these activities in other parts of San Diego Bay.

After enactment of the ordinances, boat owner Lawrence S. Graf, founder and president of the Emory Cove Boat Owners Association;[4] boat operator James Morgan; and other boat owners (collectively Graf) were notified by

---

[1]South San Diego Bay is defined in section 4.30, subdivision (b)1 of the code as "[t]hat part of San Diego Bay lying southward of a line extending in a west southwesterly direction from the southwesterly corner of the Sweetwater Wharf in Latitude 32 degrees 38' 52" N; Longitude 117 degrees 07' W, to a point on the southerly shore of Crown Cove at Latitude 32 degrees 38' 10" N, Longitude 117 degrees 08' 20" W."

[2]Port District Code section 435, subdivision (b) defines Central San Diego Bay as follows: "That part of San Diego Bay lying northerly of South San Diego Bay, as defined in this Code, and southerly of a line drawn westerly from the South Embarcadero Marina Park fishing pier to the easterlymost point of North Island Naval Station in Latitude 32 degrees 42' 10" N."

[3]Of the eight mooring and anchorage areas contained in Port District's plan, the Coast Guard designated four of them as special anchorage areas (33 C.F.R. 110.90), but declined to establish the other four as federal anchorages, stating: "The justification for [the four other anchorages] is primarily based on important state and local land use and aesthetic concerns. These factors go beyond the Coast Guard's statutory authority for regulating navigation, and it is inappropriate at this time that they be established as federal anchorages." (51 Fed. Reg. 8687, 8688.)

[4]Fort Emery Cove is located in the southwest corner of San Diego Bay. It measures 500 feet by 1,000 feet and is "dredged to a depth of 8 feet with a 200-foot-wide entrance channel dredged to 7 feet. This dredging was completed in 1944 by the United States Corps of Army

the San Diego Harbor Police that boats remaining in unauthorized areas after March 16, 1987, would be subject to citations and/or impoundment. Graf filed actions in superior court seeking to prohibit Port District from enforcing the ordinances.

On March 16, 1987, the superior court issued a temporary restraining order enjoining enforcement of the ordinance. On May 8, 1987, the superior court dissolved the temporary restraining order and denied Graf's motion for a preliminary injunction. This order was affirmed by this court in *Graf* v. *San Diego Unified Port District, supra,* 205 Cal.App.3d 1189.

Trial in Graf's action for permanent injunction began on April 19, 1990. After testimony by Graf's witnesses, the court granted Port District's motion for nonsuit under Code of Civil Procedure section 631.8. Graf appeals, contending (1) Port District exceeded its jurisdiction by establishing mooring and anchorage areas and declaring certain other areas restricted from use for anchorage; (2) citizens have a constitutional right to anchor in the bay's navigable waters; and (3) Port District's plan creates a use prohibition against anchoring in San Diego Bay and is contrary to law.

DISCUSSION

I

▉ The State of California holds title to the navigable waterways and the land beneath them within its borders as a trustee for the public. (*Colberg Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 416 [62 Cal.Rptr. 401, 432 P.2d 3].) Tidelands are included in the public trust. (*Marks* v. *Whitney* (1971) 6 Cal.3d 251, 259 [89 Cal.Rptr. 790, 491 P.2d 374].) Permissible public uses of the waterways include not only navigation, commerce and fishing, but also the right to hunt, bathe and swim, the right to preserve the tidelands in their natural state for scientific study (*City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 521 [162 Cal.Rptr. 327, 606 P.2d 362]), the right to stand, and the right to anchor a boat on the bottom of the navigable waters. (*Marks* v. *Whitney, supra,* 6 Cal.3d at p. 259.)[5] The state's power to control, regulate and utilize the navigable waterways within terms of the trust is absolute except as limited by the

Engineers and was used in World War II as a refueling and service area for seaplanes." (*Graf* v. *San Diego Unified Port Dist.* (1988) 205 Cal.App.3d 1189, 1192 [252 Cal.Rptr. 889].) Since approximately 1950, the cove and channel have been used as an anchorage area.

[5]The doctrine that the public holds the right to tidelands for purposes such as fishing, commerce and navigation originated with Roman law. (*City of Berkeley* v. *Superior Court, supra,* 26 Cal.3d at p. 521.) English common law also developed similar limitations to the rights of private persons over tidelands. (*Ibid.*) "After the American Revolution, the people of

supervisory power of the federal government. (*Colberg Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.*, *supra*, 67 Cal.2d at p. 416.)

A state, as trustee, may delegate its authority to manage and control public use to a local agency. (*City of Long Beach* v. *Lisenby* (1917) 175 Cal. 575, 579 [166 P. 333].) Under the San Diego Unified Port District Act (the act) the State of California delegated its authority to manage and control San Diego Bay to Port District.[6] Port District was established for the development, operation, maintenance, control, regulation and management of the tidelands and lands lying under the inland navigable waters of San Diego Bay. (Harb. & Nav. Code, appen. 1, § 4.) Port District was created because several separate cities and unincorporated populated areas exist in the San Diego Bay area, and the Legislature determined that only a specially created district could operate effectively to develop the harbors and port facilities. (Harb. & Nav. Code, appen. 1, § 2.) The area of Port District includes "all of the corporate area of each of the cities of San Diego, Chula Vista, Coronado, National City, and Imperial Beach . . . and any unincorporated territory in the County of San Diego contiguous thereto . . . ." (Harb. & Nav. Code, appen. 1, § 5.) Port District's jurisdiction extends only over the tidelands and submerged lands granted to the district under the act; over airports owned and operated by San Diego County and the cities which establish Port District; and over other lands conveyed by the said county or cities. (*Ibid.*) Port District's powers are to be used only as necessary or incident to development and operation of the port. (Harb. & Nav. Code, appen. 1, § 4.) Port District is governed by a board of commissioners appointed by the cities which make up the district. (*Id.* at § 16.) Section 55 of the act provides in pertinent part:

"The board shall:

"(a)   Make and enforce all necessary rules and regulations governing the use and control of all navigable waters and all tidelands and submerged lands, filled or unfilled, and other lands within the territorial limits of the district.

"(b)   Regulate and control the anchoring, mooring, towing and docking of all vessels.

"(c)   [Establish harbor police and fire protection systems.]" (Harb. & Nav. Code, appen. 1, § 55.)

---

each state acquired 'absolute right to all . . . navigable waters, and the soils under them, for their own common use. . . .' " (*Ibid.*, quoting *Martin* v. *Waddell* (1842) 41 U.S. (16 Pet.) 367, 410 10 L.Ed. 997].)

[6]The act is codified in Harbor and Navigations Code, appendix 1.

■ Graf contends a careful reading of section 55, subdivision (a) of the act reveals that Port District acted outside of its jurisdiction in designating certain areas for anchorage and mooring, and in prohibiting such activities in other areas. Under section 14 of the act the cities of the district conveyed to Port District all of their right, title and interest in and to tidelands and submerged lands. Graf reasons since the cities were able to give Port District title only to the tidelands and submerged lands beneath the edge of the bay out to the pierhead line, Port District had no jurisdiction to establish regulations in the area still held by the state, the navigable waters and submerged lands in the very center of the bay. He argues the phrase in section 55, subdivision (a) of the act—"within the territorial limits of the district"— modifies only the immediately preceding phrase, "other lands," and does not modify the phrase, "navigable waters and all tidelands and submerged lands." He claims the section thus provides that Port District's jurisdiction extends only to the tidelands and submerged lands specifically granted to Port District under the act, and that Port District has no jurisdiction to regulate the area retained by the state in the center of the bay.

Graf's argument is without merit. ■ Under the public trust doctrine, tidelands and submerged lands are subject to two types of powers. The state has proprietary powers which authorize it to use the lands for specified purposes or to transfer them into private ownership or leasehold. (*People* v. *California Fish Co.* (1913) 166 Cal. 576, 593 [138 P. 79].) The state also has separate authority to regulate and control the lands for public use. (*Ibid.*) The state may delegate its regulatory authority to local administrative agencies. (*City of Long Beach* v. *Lisenby, supra,* 175 Cal. at p. 579.)

■ Under section 14 of the act, the cities of the district conveyed to Port District the proprietary rights to the tidelands and submerged lands owned by each city.[7] Sections 4, 30 and 55 of the act conferred on Port District the authority to regulate and manage the navigable waters and submerged lands of the bay, with the state retaining its proprietary interest in the submerged lands at the bay's center.[8] Graf's reading of section 55 of the act is erroneous and would make a meaningless patchwork of regulatory powers. The act established Port District for the purpose of eliminating just

[7]Section 14 of the act provides in pertinent part:
"Upon the establishment of the district, every city specified in Section 5 shall convey to the district all its right, title and interest in and to the tidelands and submerged lands, together with any facilities thereon, which are owned by the city, including any such lands which have been granted in trust to the city by the state in the Bay of San Diego."
[8]Section 4 of the act established Port District for the "acquisition, construction, maintenance, operation, development and regulation of harbor works and improvements, . . . for the development, operation, maintenance, control, regulation and management of the Harbor

such a problem. (Harb. & Nav. Code, appen. 1, § 2.) Port District acted within its jurisdiction in regulating the mooring and anchoring activities on the navigable waters held by Port District and by the state within the territorial limits of the district.[9]

## II

■ Graf next contends the ordinances infringe upon the public's constitutional right to anchor freely in the state's navigable waterways. Citing the long development of the doctrine of public trust over navigable waters, he maintains that under the doctrine, the right to use the navigable waters of the state cannot be abridged and such use includes the right to anchor. Graf points out that the California Constitution provides free navigation of the state's waterways to the public and requires the Legislature to enact laws which will allow the most liberal construction of this provision.[10] He complains that in enacting Ordinances 1200 and 1201 Port District has made it a crime to anchor in San Diego Bay in other than designated anchorages. He argues the evidence presented at trial showed that the one area where boats may anchor for longer than 72 hours is dangerous to life and property.

The state's authority to control and regulate usage of its navigable waterways is absolute when it is acting within the terms of the public trust. (*Marks v. Whitney, supra*, 6 Cal.3d at p. 260.) The state has delegated to Port District regulatory power over San Diego Bay. (Harb. & Nav. Code, §§ 4, 30, 55.) That regulatory power is akin to the police power which authorizes a state to subject individual rights to reasonable regulation in order to protect the

of San Diego upon the tidelands and lands lying under the inland navigable waters of San Diego Bay, and for the promotion of commerce, navigation, fisheries, and recreation thereon."

Section 30 of the act provides that Port District is empowered to "regulate and control the anchoring, mooring, towing, and docking of all vessels."

[9]The California State Lands Commission (State Lands) is the state agency charged with jurisdiction over ungranted lands and submerged lands in California, including the land not granted to Port District but reserved to the state. State Lands also exercises oversight authority over Port District's administration of the public trust lands granted to it. In its amicus curiae brief filed in support of Port District, State Lands reports that it has not adopted its own regulations for anchorage in the San Diego Bay because by legislation under the act the state enabled Port District to regulate anchorage in the bay and State Lands supports the regulations developed by Port District as adequate and appropriate.

[10]The California Constitution, article X, section 4, provides:

"No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall be always attainable for the people thereof."

general welfare. (*Western Indemnity Co.* v. *Pillsbury* (1915) 170 Cal. 686, 694 [151 P. 398].) ■ Judicial review of police power is limited to determining whether a regulation is reasonably related to promoting public health, safety, comfort and welfare and whether the means adopted are reasonably appropriate to the purpose. (*Higgins* v. *City of Santa Monica* (1964) 62 Cal.2d 24, 30 [41 Cal.Rptr. 9, 396 P.2d 41].)

■ Here, the ordinances enacted are reasonably related to protecting general navigation in the bay. Port District determined that with the growth of population and resultant pressures on the resources of the bay, problems were created by continuing to allow unrestricted anchorage. It then undertook a six-year study, which identified problems caused by allowing boaters to anchor at will. Among its findings, the study showed that anchorage in South San Diego Bay was dangerous to the vessels anchored there. A study of the tides and currents indicated there was very little water circulation in the south bay, which intensified pollution caused by the vessels anchored in that section of the bay. (*Graf* v. *San Diego Unified Port Dist.*, *supra*, 205 Cal.App.3d at p. 1192.) Determining that free anchorage was detrimental to overall development and public use of the bay, Port District then developed a plan which provided eight mooring or anchorage areas in the bay and prohibited free anchorage in other areas. Ordinances 1200 and 1201, enacting the plan, were a proper exercise of Port District's regulatory authority and were reasonably related to preserving the public interest in the bay.

Graf relies on *People* ex rel. *Younger* v. *County of El Dorado* (1979) 96 Cal.App.3d 403 [157 Cal.Rptr. 815]. There, the County of El Dorado enacted an ordinance which prohibited floating, swimming or traveling by artificial means on a 20-mile stretch of the American River. (*Id.* at p. 405.) The Court of Appeal held that because that section of the river was unsuited for purposes other than rafting, the ordinance was invalid in that it effectively banned all public use of that part of the river. (*Id.* at p. 406.) Here, the situation is different. The public may continue to use the bay for all lawful purposes. The ordinances only prohibit anchoring at will and provide regulated areas where boats may moor or anchor. Also in *County of El Dorado* the county was acting only in its regulatory capacity, whereas, here, Port District was exercising not only its regulatory power but also the public trust responsibilities delegated to it by the state.

Boaters do not have a constitutional right to unregulated long-term anchorage in public navigable waters. Graf points out that the Supreme Court in *Marks* v. *Whitney*, *supra*, 6 Cal.3d 251 stated that the public trust includes the public's right to "fish, hunt, bathe, swim, to use for boating and general recreation purposes the navigable waters of the state, and to use the bottom

of the navigable waters for anchoring, standing, or other purposes." (*Id.* at p. 259.) This does not mean, however, that boaters have a constitutional right to the unregulated long-term anchoring Graf seeks. The *Marks* court drew its reference to anchoring from *Bohn* v. *Albertson* (1951) 107 Cal.App.2d 738 [238 P.2d 128], in which the appellate court spoke of anchoring as " 'the incidental use of the bottom.' " (*Id.* at p. 749.) The court in *Bohn* also explained: " ' "The interest of the public in the . . . bed of a navigable river is analogous to that of the public in a public road. It has the right of passage over the stream as it had over the road." ' " (*Id.* at p. 756.) Boaters hold no constitutional right to unregulated long-term anchoring in public waters.

III

Graf also maintains the trial court erred in not finding Anchorage A-8, the one site designated in the plan for long-term anchorage, to be unsafe. He argues the dangerous conditions at Anchorage A-8 render the ordinances unconstitutional in that they effectively give the bay a no-use designation.

Graf is incorrect. The ordinances do not prohibit use of the bay. They merely restrict mooring and anchorage to certain areas.[11] The public continues to enjoy access to the bay for all permissive purposes. The fact that Graf presented evidence that Anchorage A-8 was undesirable does not mean that public usage of the bay has been extinguished. As the trial court stated, "there is no access question in this case. The plaintiffs have the same access rights to any part of the bay as anyone else. The issue, as I perceive it, is one of regulation of what we've discussed here as navigable waters." A determination of whether Anchorage A-8 was safe or unsafe was not requisite to the court's finding that the ordinances are constitutional and do not establish a no-use designation of the bay.

DISPOSITION

The judgment is affirmed.

Kremer, P. J., and Todd, J., concurred.

A petition for a rehearing was denied July 22, 1992, and appellants' petition for review by the Supreme Court was denied September 23, 1992.

---

[11]Boaters, of course, may dock boats at private marinas in the bay provided they pay the charges imposed by the marinas. Witnesses at trial testified, however, that some boaters cannot use private marinas for various reasons, including the size of their boats and their inability to procure the insurance required by the marinas.